[No. B097529. Second Dist., Div. Four. Mar. 17, 1999.]

JOE NOTRICA, Plaintiff and Respondent, v.
STATE COMPENSATION INSURANCE FUND, Defendant and
Appellant.

**COUNSEL**

Richard A. Krimen; Charles W. Savage; Barbara J. Gallios; Sheppard, Mullin, Richter & Hampton, Andre J. Cronthall; Horvitz & Levy, Christina J. Imre and Julie L. Woods for Defendant and Appellant.

Sonnenschein, Nath & Rosenthal, Paul E. B. Glad, Peter A. Smalbach and Sean McEneaney for California Workers' Compensation Institute as Amicus Curiae on behalf of Defendant and Appellant.

Morrison & Foerster, Raoul Kennedy and Sheryl C. Medeiros for National Association of Independent Insurers as Amicus Curiae on behalf of Defendant and Appellant.

Shernoff, Bidart & Darras, Michael J. Bidart; Roxborough, Pomerance & Gallegos, Nicholas P. Roxborough, Drew Pomerance, Esteban G. Gallegos;

Bryan Cave; David H. Raizman; Barbara A. Krieg; and Sheldon Eisenberg for Plaintiff and Respondent.

Joseph V. Capurro for California Applicants' Attorneys Association as Amicus Curiae on behalf of Plaintiff and Respondent.

**OPINION**

**HASTINGS, J.—**

## INTRODUCTION

Joe Notrica, doing business as Notrica's 32nd Street Market (Notrica), sued his workers' compensation insurer, State Compensation Insurance Fund (SCIF, sometimes State Fund or Fund), to recover in tort and for unfair business practices, based on allegations relating to SCIF's case reserve and claims handling policies and practices. In a bifurcated proceeding, the jury awarded Notrica $478,606 in compensatory damages and $20 million in punitive damages; the trial court enjoined SCIF from various business practices and awarded $333,319.65 in attorney fees. SCIF appeals from the judgment. We conclude that the punitive damages award must be reduced to $5 million and otherwise affirm.

## PROCEDURAL BACKGROUND

In its complaint against SCIF, Notrica asserted two causes of action here pertinent: tortious breach of the implied covenant of good faith and fair dealing, to be determined by the jury; and unfair, unlawful, or fraudulent business practices (Bus. & Prof. Code, § 17200), to be determined by the trial court.

The implied covenant cause of action alleged the following pertinent facts.

SCIF is the state's largest workers' compensation carrier, created in 1914 as a public enterprise fund and subject to the jurisdiction and control of the state Insurance Commissioner. SCIF has issued policies to more than 250,000 California employers and has held itself out to the public as the most experienced carrier in California. SCIF, required by Insurance Code section 11775 to be neither more nor less than self-supporting, owns or controls assets exceeding $2.5 billion and "enjoyed a net investment gain on investment income of over $370 Million for the year ending December 31, 1989. Premiums earned for that year exceed[ed] $1.8 Billion." SCIF

conducts its business in the same manner as a private carrier, can and does compete with private carriers, and is subject to the same standard of liability. SCIF may be sued in all actions arising out of any act or omission in connection with its business affairs, whether in tort or contract, pursuant to Insurance Code section 11783.[1]

SCIF issued a workers' compensation policy (Policy) to Notrica for the period June 1988 through June 1989, which obligated it to investigate, defend, and settle claims reasonably and to estimate reasonable claim reserve levels. SCIF failed to meet these obligations, resulting in its breach of the implied duty of good faith and fair dealing. SCIF breached this duty for the purposes of either receiving higher premiums or paying less dividends, and increasing its revenues and surpluses while impairing Notrica's financial interests. As a proximate result, Notrica paid higher premiums to workers' compensation carriers, failed to receive sufficient dividends, and was forced to hire professionals to assist it in reviewing SCIF's conduct and to prosecute this action.

SCIF's conduct had been intentional and constituted fraud, oppression, or malice, justifying imposition of punitive damages under Civil Code section 3294.

Under the unfair competition cause of action (Bus. & Prof. Code § 17200 et seq.), which requested restitution, punitive damages, and injunctive relief, Notrica included the following additional allegations. SCIF failed to disclose certain internal policies in order to induce Notrica to enter into the Policy agreement. Notrica reasonably relied upon the inducements and incurred damages as a result. SCIF intentionally, wrongfully and with fraud, oppression, or malice, refused to deal directly with Commercial Benefits, Notrica's authorized representative for workers' compensation insurance concerns, thereby interfering with the contractual relationship between Notrica and Commercial Benefits. SCIF represented that denials of reviews of claims files was to protect the privacy interests of individuals; however, its motives were to perpetrate a fraud upon Notrica and other insureds, to destroy the third party risk manager industry, to compete unfairly with private insurers, to inhibit or prevent discovery of SCIF's fraudulent and negligent conduct, to gain and maintain an unfair advantage over its insureds and the industry,

---

[1]Insurance Code section 11783 reads: "The State Compensation Insurance Fund may: [¶] (a) Sue and be sued in all actions arising out of any act or omission in connection with its business or affairs. [¶] (b) Enter into any contracts or obligations relating to the State Compensation Insurance Fund which are authorized or permitted by law. [¶] (c) Invest and reinvest the moneys belonging to the fund as provided by this chapter. [¶] (d) Conduct all business and affairs and perform all acts relating to the fund whether or not specifically designated in this chapter."

to enable it to collect exorbitant premium payments, all of which acts constitute dishonest, deceptive, oppressive, fraudulent, unfair, and destructive conduct. SCIF's interference resulted in Notrica's overpaying premiums.

The jury rendered several findings by special verdict. It found by a preponderance of the evidence that SCIF had breached the duty of good faith and fair dealing and that such breach had resulted in Notrica's suffering damages totaling $478,606.[2] The jury found by clear and convincing evidence that SCIF had acted with fraud, awarding $20 million in punitive damages.

The trial court, sitting in equity, found SCIF had engaged in unfair business practices (Bus. & Prof. Code, § 17200). It issued an injunction requiring SCIF to delete the term "maximum probable potential" from its claims estimating manual and to return to a previous standard. It further enjoined SCIF from denying insureds access to claims files as relevant to the employer's premium, from refusing to communicate with an insured's authorized representative, and from refusing to allow such representative to conduct an appropriate claim file review (Lab. Code, § 3762).

The trial court found that Notrica was the prevailing party on its cause of action for breach of the implied covenant of good faith and fair dealing, and on that ground it awarded costs and reserved jurisdiction to determine entitlement to reasonable attorney fees. At a postjudgment hearing, the trial court awarded some $300,000 in attorney fees.

SCIF asserts the following contentions on appeal:

I. An insured employer should be prohibited from recovering tort damages where the only damage claimed is the impact on future premiums.

II. The bad faith judgment must be reversed because it is not supported by SCIF's reserving practices, claims handling, or claims review policies, including those governing its relationship to the insured's agents.

III. The compensatory damage award must be reversed for new trial.

IV. The injunction is not supported by the law or the facts.

V. The punitive damages award must be reversed and any new trial on this issue requires retrial of all issues.

VI. The award of attorney fees should be reversed or at least limited.

---

[2]The $478,606 was offset by $152,611.40, an amount stipulated to be the total amount of premiums Notrica owed SCIF, rendering a net compensatory damage award of $325,994.60.

■■■■■■■■■■■■■■■■

Discussion

## I. Basis for Tort Damages

The "particular risk presented by the insured's experience or insurance history" is one of the factors that an insurer is permitted to consider in setting premiums for its insureds. (*P. W. Stephens, Inc.* v. *State Compensation Ins. Fund* (1994) 21 Cal.App.4th 1833, 1836 [27 Cal.Rptr.2d 107].) In the instant case, SCIF employed what it termed the "maximum probable potential" standard to workers' compensation claims against Notrica when setting aside amounts as reserves for Notrica cases. "The 'maximum probable potential' standard means that the adjuster reserves for the absolute most SCIF may have to pay without any exercise of discretion or judgment as to the realistic value of each claim. . . . [T]he greater the claim reserves, the greater the insured's loss history, which in large part determines the insured's experience modification factor—which in turn is used by SCIF to calculate the insured's premium. Claim reserves also impact whether an insured receives a dividend or not." (*MacGregor Yacht Corp.* v. *State Comp. Ins. Fund* (1998) 63 Cal.App.4th 448, 457 [74 Cal.Rptr.2d 473], review den. July 29, 1998.) By implication, the jury in the instant case found SCIF had failed to estimate reasonable claim reserve levels, resulting in Notrica's paying higher premiums and receiving lower dividends.

■■■ SCIF first contends that an impact on future premiums is not a sufficient basis in and of itself to support the tort damage award for breach of the implied covenant of good faith and fair dealing.[3] SCIF notes that the goal of the state workers' compensation system is to maintain sufficient reserves to compensate injured workers under its policy of liberal construction to provide maximum benefits to the injured employee, and that insurers must set reserves in the amount for which, in the language of Insurance Code section 923.5, the insurer "may be liable."[4]

We first address SCIF's argument that permitting tort recovery based solely on the fact that its practices impacted Notrica's future premiums is

---

[3]The California Supreme Court has explained: "In sum, the covenant is implied as a supplement to the express contractual covenants, to prevent a contracting party from engaging in conduct that frustrates the other party's rights to the benefits of the agreement. [Citation.]" (*Waller* v. *Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 36 [44 Cal.Rptr.2d 370, 900 P.2d 619].) A bad faith action can only be maintained when policy benefits are due under the contract. (*Id.* at p. 35; *Love* v. *Fire Ins. Exchange* (1990) 221 Cal.App.3d 1136, 1153 [271 Cal.Rptr. 246].)

[4]Labor Code section 3202 provides that workers' compensation laws "shall be liberally construed by the courts with the purpose of extending their benefits for the protection of

error. SCIF claims that such policy creates an irreconcilable conflict of interest for the carrier vis-à-vis its insured employer and the claimant employee.[5] SCIF describes this "conflict" as the employer's desire for lower reserves, which SCIF insists would result in pressure on the insurer to look for ways to deny claims and to pay as little as possible to injured employees, as compared to the duty of the insurer to maintain sufficient reserves to pay workers' legitimate claims. *Security Officers Service, Inc.* v. *State Compensation Ins. Fund* (1993) 17 Cal.App.4th 887 [21 Cal.Rptr.2d 653], expressly rejected SCIF's "conflict" argument: "SCIF asserts that to measure its practices under a good faith standard would improperly conflict with the workers' compensation rights of claimants, to whom SCIF is directly liable, but who are limited to compensation remedies for insurers' delay [citation], because SCIF would be forced to attune its efforts toward minimizing plaintiff's premiums, as opposed to proper claims determination and payment. The conflict is a false one. A good faith standard does not pit plaintiff's interests against its claimants'. From the standpoint of diligence and proper reserve-setting, the interests of both are identical. Indeed, competent performance at reasonable cost is the combined goal and standard for all professions and businesses, including insurance." (*Security Officers Service, Inc.* v. *State Compensation Ins. Fund, supra,* 17 Cal.App.4th at p. 898.) Furthermore, the amount of reserve set for a particular claim has no impact whatsoever on the amount ultimately paid an injured worker. (See *Lipton* v. *Superior Court* (1996) 48 Cal.App.4th 1599, 1613 [56 Cal.Rptr.2d 341].)

persons injured in the course of their employment." (See, e.g., *Johnson* v. *Workers' Comp. Appeals Bd.* (1984) 37 Cal.3d 235, 241 [207 Cal.Rptr. 857, 689 P.2d 1127] [courts must view the Workers' Compensation Act from the standpoint of the injured worker and with the objective of securing the maximum benefits to which he or she is entitled]; *Garza* v. *Workmen's Comp. App. Bd.* (1970) 3 Cal.3d 312, 317 [90 Cal.Rptr. 355, 475 P.2d 451] [even though employee bears the burden of proving that his injury was sustained in the course of his employment, all reasonable doubts as to whether an injury arose out of employment are to be resolved in favor of the employee].)

As here pertinent, Insurance Code section 923.5 reads:

"Each insurer transacting business in this state shall at all times maintain reserves in an amount estimated in the aggregate to provide for the payment of all losses and claims for which the insurer may be liable, and to provide for the expense of adjustment or settlement of losses and claims.

"The reserves shall be computed in accordance with regulations made from time to time by the commissioner. The promulgation of the regulations by the commissioner, or any changes thereto or amendment thereof, shall be in accordance with the procedure provided in Chapter 3.5 (commencing with Section 11340) of Part 1 of Division 3 of Title 2 of the Government Code. The commissioner shall make the regulations upon reasonable consideration of the ascertained experience and character of such kinds of business for the purpose of adequately protecting the insured and securing the solvency of the insurer."

[5]Insurance Code section 11651 reads: "Every such contract or policy shall contain a clause to the effect that the insurer will be directly and primarily liable to any proper claimant for payment of any compensation for which the employer is liable, subject to the provisions, conditions and limitations of the policy."

SCIF argues further that the implied covenant does not impose a duty on it to protect the insured's interest in lower premiums. SCIF acknowledges that *Security Officers Service, Inc.* v. *State Compensation Ins. Fund, supra,* 17 Cal.App.4th 887, reached a different conclusion but argues at great length that *Security Officers,* as well as several other cases it finds troublesome, were wrongly decided.

In *Security Officers* the trial court sustained without leave to amend SCIF's demurrer to the insured's complaint for breach of contract and breach of the implied covenant of good faith and fair dealing, alleging that the insured had been damaged by SCIF's systematic failure to process claims diligently and by SCIF's unreasonable inflation of claim reserves—complaints made herein by Notrica. The appellate court reversed, holding that "under an insurance regime in which the insured's annual claims experience inexorably influences its premiums, the insurer may be liable if it processes claims and sets reserves without good faith regard for their impact on the insured's premiums and potential dividends." (17 Cal.App.4th at p. 890.) *Security Officers* noted that " '[t]he covenant of good faith finds particular application in situations where one party is invested with a discretionary power affecting the rights of another.' [Citation.]" (*Id.* at p. 894, quoting *Carma Developers (Cal.), Inc.* v. *Marathon Development California, Inc.* (1992) 2 Cal.4th 342, 372 [6 Cal.Rptr.2d 467, 826 P.2d 710].) "Thus, 'the insurer, when determining whether to settle a claim, must give at least as much consideration to the welfare of its insured as it gives to its own interests.' [Citation.]" (17 Cal.App.4th at p. 894, quoting *Egan* v. *Mutual of Omaha Ins. Co.* (1979) 24 Cal.3d 809, 818 [169 Cal.Rptr. 691, 620 P.2d 141] [disability policy].) *Security Officers* concluded that the more traditional failure-to-settle cases "confirm that the insurer's discretion in handling claims is restricted when its exercise may impair the insured's interests under the policy." (17 Cal.App.4th at p. 896.) The court reasoned that because the insured is "bound to pay SCIF—or, allegedly, any successive insurer—a policy premium that SCIF's claims and reserves handling will directly influence," it is logical that ". . . the covenant of good faith and fair dealing indeed requires SCIF to conduct its claims resolution and reserve allocation processes with good faith regard for [plaintiff insured's] interests." (*Id.* at p. 896.)

*Tricor California, Inc.* v. *State Compensation Ins. Fund* (1994) 30 Cal.App.4th 230 [35 Cal.Rptr.2d 550], subscribed to the reasoning of *Security Officers* in its reversal of the trial court's dismissal of a cause of action for breach of the implied covenant. (*Id.* at pp. 238-240.)

The case of *MacGregor Yacht Corp.* v. *State Comp. Ins. Fund, supra,* 63 Cal.App.4th 448, also supports *Security Officers.*[6] In *MacGregor,* the employer brought an action against SCIF to recover damages in tort and for breach of express and implied contract. The trial court concluded that the tort cause of action was barred by the statute of limitations. In the nonjury trial, the court found, inter alia, that SCIF had breached the implied covenant of good faith and fair dealing by "refusing to permit the insured access to claim files or other relevant claims data, refusing or failing to settle claims reasonably, setting unreasonably high reserves, modifying and concealing its reserving practices which maximized receipts at the expense of its insureds, and setting reserves at a 'maximum probable potential' exposure rather than at the most probable result of the case." (*Id.* at p. 452.)

On appeal in the *MacGregor* case, SCIF contended, as in the instant case, that its reserving and claims handling practices, as well as its restriction of employer access to claims files, did not violate the implied covenant. The *MacGregor* court disagreed, referencing *Tricor*'s invocation of language from *Security Officers*: " ' "Because the powers so confided in SCIF's discretion will impact the degree of plaintiff's primary burden under the policy, it appears logical that the covenant of good faith and fair dealing indeed requires SCIF to conduct its claims resolution and reserve allocation processes with good faith regard for plaintiff's interests. [Citation.]" ' " (*MacGregor Yacht Corp.* v. *State Comp. Ins. Fund, supra,* 63 Cal.App.4th at p. 456.) *MacGregor* also referenced *Lance Camper Manufacturing Corp.* v. *Republic Indemnity Co.* (1996) 44 Cal.App.4th 194, 201-202 [51 Cal.Rptr.2d 622]: " '[T]he alleged mishandling of claims by an insurer occasioned by the hiring of inadequate legal and medical advisers and insufficient defense investigation and resolution of pending claims implicates the insurance policy's implied covenant of good faith and fair dealing, which "imposes limits on the insurer's latitude in discharging its contractual right or duty to defend, investigate and settle claims. [Citation.]" ' " (*MacGregor Yacht Corp.* v. *State Comp. Ins. Fund, supra,* 63 Cal.App.4th at p. 456.)

With respect to SCIF's argument that the implied covenant does not impose a duty on the carrier to protect its insured's interest in lower premiums, *MacGregor* states: "[D]espite the alleged liberal nature of the local WCAB, for an insurer to fulfill its obligation not to impair the right of the insured to receive the benefits of the [policy] agreement, the insurer 'is obligated to give the interests of the insured at least as much consideration as it gives to its own interests.' [Citation.]" (63 Cal.App.4th at p. 457.)

Finally, SCIF argues that even if Notrica can state an implied covenant claim, recovery should be limited to contract rather than tort remedies. SCIF

---

[6]Both parties have filed letter briefs in response to *MacGregor.*

again acknowledges that *Security Officers* is to the contrary (*Security Officers Service, Inc.* v. *State Compensation Ins. Fund, supra,* 17 Cal.App.4th at p. 899 [plaintiff allowed to elect between suing in contract or in tort]). SCIF's position has also been rejected by *Courtesy Ambulance Service* v. *Superior Court* (1992) 8 Cal.App.4th 1504, 1509, 1511-1519 [11 Cal.Rptr.2d 161], followed by *Maxon Industries, Inc.* v. *State Compensation Ins. Fund* (1993) 16 Cal.App.4th 1387, 1390-1394 [20 Cal.Rptr.2d 730]. We have reviewed in detail the lengthy criticisms authored by SCIF and related amici curiae of *Courtesy Ambulance Service, Security Officers, Tricor,* and *Lance Camper*; the arguments are not persuasive. We agree with the holdings of the above cases on this issue. (See also *Foley* v. *Interactive Data Corp.* (1988) 47 Cal.3d 654, 684-685 [254 Cal.Rptr. 211, 765 P.2d 373]; *Salimi* v. *State Comp. Ins. Fund* (1997) 54 Cal.App.4th 216, 218-222 [62 Cal.Rptr.2d 640]; cf. *Waller* v. *Truck Ins. Exchange, Inc., supra,* 11 Cal.4th at pp. 34-35.)

## II. *The Bad Faith Judgment*

■ SCIF contends that its reserving practices cannot support the bad faith judgment. SCIF first asserts that judicial input threatens its solvency, entails "microeconomic managing," and that the matter should be left to the Legislature and administrative bodies. In support of this position, SCIF cites two business judgment rule cases.[7] *Wolfe* v. *State Farm Fire & Casualty Ins. Co.* (1996) 46 Cal.App.4th 554 [53 Cal.Rptr.2d 878], approved the decision of the trial court to sustain demurrers without leave to amend in a complaint which alleged that the refusal of insurers to continue to sell homeowner-earthquake insurance policies after the devastating Northridge earthquake was an unfair business practice. SCIF attempts to analogize *Wolfe* to the instant case by claiming SCIF established at trial it had changed its reserving language solely to encourage adjusters to set adequate reserves at an earlier date in the claims process because its past reserves had been too low. SCIF also cites *Lee* v. *Interinsurance Exchange* (1996) 50 Cal.App.4th 694 [57 Cal.Rptr.2d 798], a case in which former subscribers were unsuccessful in their action to compel the defendant reciprocal insurer to deposit into the subscribers' savings accounts all surplus funds that exceeded legally required amounts. SCIF does not cite, nor have we found, any case employing the business judgment rule in the context of the instant case, but in any event the rule cannot be held to supplant the implied covenant of good faith and fair dealing. (See also *Tricor California, Inc.* v. *State Compensation Ins.*

---

[7] The business judgment rule is codified in Corporations Code section 309, which reads as pertinent: "(a) A director shall perform the duties of a director, including duties as a member of any committee of the board upon which the director may serve, in good faith, in a manner such director believes to be in the best interests of the corporation and its shareholders and with such care, including reasonable inquiry, as an ordinarily prudent person in a like position would use under similar circumstances."

*Fund, supra,* 30 Cal.App.4th at p. 242; *Lance Camper Manufacturing Corp.* v. *Republic Indemnity Co., supra,* 44 Cal.App.4th at p. 203; *Salimi* v. *State Comp. Ins. Fund, supra,* 54 Cal.App.4th at p. 222.)

SCIF next asserts that its reserving practices did not constitute bad faith. It mounts several arguments.

First, that since adequate reserves are essential to an insurer's successful operation (Ins. Code, § 923.5, fn. 4, *ante*), SCIF must have wide latitude in setting reserving policy.[8] Here, SCIF characterizes differences in reserve policies as merely philosophical, and it revisits its business judgment rule argument. We have rejected the business judgment rule argument.

SCIF next asserts that its disapproved reserving policy actually is reasonable as a matter of law on the ground that the policy is consistent with the goal that the reserve " 'reflect, as accurately as possible, the insured's *potential* liability.' " (*Lipton* v. *Superior Court, supra,* 48 Cal.App.4th at p. 1613.) In support of this position, SCIF cites two documents under seal. The first is a one-page document titled "Case Estimates," dated December 1, 1986, that includes the following statement under "Policy": "Individual case estimates must be sufficient to allow the State Fund to assess and eventually discharge its liability. All estimates shall be accurate and adequate, reflecting the current information in the claims file. The basis for estimates will be documented in the claims file." The second is an eight-page document titled "Case Estimates," dated July 1, 1989. It sets forth the "maximum probable potential cost" standard and states that accurate estimates are vital to the fiscal solvency of SCIF and that reserves have a direct impact on policyholders' dividends, experience modifications, and premium rates as developed by the Workers' Compensation Insurance Rating Bureau.

SCIF also points to evidence it presented at trial that its claim reserve standard always was that the claim reserves be *adequate.* The description

---

[8]"Loss reserves . . . represent the amount anticipated to be sufficient to pay all obligations for which the insurer may be responsible under the policy with respect to a particular claim. That amount necessarily includes expenses that are likely to be incurred in connection with the settlement or adjustment of the claim, as well as the legal fees and other costs required to defend the insured. . . . [T]hey are statutorily compelled estimates and are likely to be frequently adjusted during the course of the litigation. Thus, a particular reserve amount may be substantially more or less than the amount ultimately paid on a particular claim. [¶] 'A common misconception is that an insurer's loss reserves are the same as settlement authority. They are not. The main purpose of a loss reserve is to comply with statutory requirements and to reflect, as accurately as possible, the insured's *potential* liability. It does not automatically authorize a settlement at that figure.' (Croskey et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 1995) ¶ 1:120 at p. 1-20, italics in original.)" (*Lipton* v. *Superior Court, supra,* 48 Cal.App.4th at p. 1613.)

*realistic and reasonably anticipated final costs* is characterized as an early guideline that helped adjusters to reach the reserve standard; *maximum probable potential cost* was adopted in July 1989 after the National Association of Insurance Commissioners reported that SCIF fell below its recommended range for claim reserves, three of eleven "tests." SCIF notes that Norm Hansen, a SCIF executive vice-president, testified he had understood that the new guideline had been adopted to encourage claims adjusters to take "a more considered approach in putting a reserve on a claim." Geri Madden, SCIF's governmental relations officer, testified that consideration of the policyholder was always present since a healthy SCIF was in the best interests of everyone.

Finally, SCIF claims in support of its position on the issue of reasonableness that its "maximum probable potential cost" reserve guideline is supported by statute. It notes the language of Insurance Code section 923.5 (fn. 4, *ante*): "all losses and claims for which the insurer *may* be liable." (Italics added.) SCIF argues that the statute requires the insurer to reserve for its *potential* liability and therefore its reserving practices are reasonable by definition. SCIF also asserts that its language "virtually mirrors" the self-insurer standards of the Department of Insurance.[9]

Although the referenced testimony and SCIF's reserve policy statements can be understood as evidence of its good faith, SCIF's actions constitute substantial evidence in support of the contrary findings of fact. (*Western States Petroleum Assn.* v. *Superior Court* (1995) 9 Cal.4th 559, 571 [38 Cal.Rptr.2d 139, 888 P.2d 1268].) SCIF admitted at trial that it was not in any financial danger when it adopted the new guideline, and, in fact, had a $712 million surplus. Madden, who first suggested the new guideline, testified that "maximum probable potential cost" meant that it was to be assumed that the worker would prevail in court and thus all contrary evidence was to be disregarded. SCIF did not inform its insureds, including Notrica, of the change in its reserve policy guideline. SCIF developed a training memorandum to assist its sales staff in persuading insureds and potential customers that an "actual, realistic value" would be assigned to all claims. The change to maximum probable potential cost resulted in Notrica's claims being over-reserved by $1,149,424 (with a margin of error of 0.1 to 2.5 percent), and Notrica paying a total of $598,257 in additional premiums from 1990 through 1993. This is substantial evidence which supports the

---

[9]"Each indemnity claim listed on the self insurer's annual report shall be estimated on the basis of computations which will develop the *probable total future cost* of compensation and medical benefits due or *potentially due*. Future liabilities on the annual report must represent the probable total future cost of compensation for the injury or disease over the life of the claim based on the information available in the claim file at the cut-off date of the period of time covered by the annual report." (Cal. Code Regs., tit. 8, § 15300, subd. (b), italics added.)

finding of bad faith in SCIF's implementation of Insurance Code section 923.5.

SCIF next states the truism that the implied covenant "does not require SCIF to engage in risky or unlawful reserving practices." SCIF asserts that to adopt Notrica's approach to claim reserves would result in under-reserved claims and would violate Insurance Code section 923.5. However, the parties had first operated under the previous reserve guideline of "realistic and reasonably anticipated final cost," with which Notrica was apparently satisfied since it again contracted with SCIF for coverage while ignorant of the guideline change. Notrica filed this action in response to the problems generated under the new reserve guideline of "maximum probable potential cost." As will be seen later in this opinion, the evidence supports the conclusion that SCIF's solvency was never at risk.

SCIF next contends that its claims handling protocol cannot support the bad faith judgment, asserting that it was not required to conduct "investigatory fishing expeditions"—a proposition with which all would agree—and that Notrica failed to prove it had suffered any damages as a result of improper claims handling. SCIF further asserts that Notrica should have been required to try in this action each workers' compensation claim at issue, and SCIF selects several of the Notrica claims to argue there was mere speculation that if SCIF had done something different Notrica would have benefited.

SCIF strays from the issue. The trial court qualified Lucille Van der Heyden as Notrica's expert witness on claims handling; SCIF raised no objection. Van der Heyden testified that, based on her opinion of what constitutes good faith claims handling, 31 of the cases filed against Notrica called for investigative measures greater than those employed by SCIF. Several of these claims cases were examined in detail at trial. The finders of fact credited Van der Heyden. As previously noted, the amount reserved on such cases directly impacted Notrica's premiums.

With respect to the "trial within a trial" demand, the trial court listened to extensive argument in response to SCIF's bid to put one of the allegedly injured employees on the stand. The trial court denied the request, based upon Evidence Code section 352. This was proper.[10]

SCIF asserts that its policy against employer and employer-representative hands-on review of claims files was reasonable as a matter of law in that it

---

[10]The trial court stated in part: "I'm going to sustain the objection. I don't think we're going to retry a workers compensation claim. If we do that, you're entitled to bring every applicant in here. In every case that you go to try and you're going to say, 'Judge Satt allowed it. We're entitled to it.' [¶] You're not entitled to it. What this case is all about is as [Notrica

protected the employee's constitutional right to privacy and is supported by statute. As previously stated, the judgment enjoins SCIF from denying insureds access to claims files as relevant to the employer's premium, from refusing to communicate with an insured's authorized representative, and from refusing to allow such representative to conduct an appropriate claim file review, in accordance with Labor Code section 3762. Although Labor Code section 3762 was not in effect during the period Notrica was insured by SCIF, the reference in the judgment reflects the concern of the trial court that the rights of both the employee and the employer be protected.[11] There is no ground for concluding that this portion of the judgment is incorrect, as will be discussed in greater detail later in this opinion.

### III. *The Compensatory Damages Award*

SCIF first argues that the trial court imposed an erroneous *strict liability* standard for bad faith when it instructed the jury as follows:

"In considering whether the defendant workers' compensation insurance company acted in good faith or in bad faith in administering the workers' compensation claims filed against the insured, you should consider all the evidence which tends to establish either good faith or bad faith, including, but not limited to, evidence on the following factors:

"Whether the workers' compensation insurance company did or did not properly investigate the claim;

"Whether the workers' compensation insurance company did or did not properly defend the insured in a particular workers' compensation claim or claims;

---

states]: What was in the . . . files? What did the adjuster base his opinion on? What did he do? What didn't he do? Not whether you're going to bring this applicant or any other applicant in here and say, 'I had these injuries. I was believable. I am truthful, I'm not fraudulent. I'm not making a fraudulent claim. Everything I did, I did in my best interest. I told the adjuster this. I did this.' [¶] We're not going to retry that. I think they're right. What this case is all about is what was in the claims files and what you did or did not do in reference to that."

[11]Labor Code section 3762 currently reads: "The insurer shall discuss all elements of the claim file that affect the employer's premium with the employer, and shall supply copies of the documents that affect the premium at the employer's expense during reasonable business hours. The right provided by this section shall not extend to any document that the insurer is prohibited from disclosing to the employer under the attorney-client privilege, any other applicable privilege, or statutory prohibition upon disclosure, or under Section 1877.4 of the Insurance Code [chapter 12, the Insurance Frauds Prevention Act, article 7, Workers' Compensation Insurance Fraud Reporting, section 1877.4, information acquired pursuant to the article shall not be part of the public record and is privileged]." (Added by Stats. 1993, ch. 121, § 28; amended by Stats. 1993, ch. 1242, § 25.)

"Whether the workers' compensation insurance company did or did not, when setting the reserves, consider the impact that those reserves had on its insured's ability to receive dividends;

"Whether the workers' compensation insurance company did or did not, when setting the reserves, consider the impact that those reserves would have on the insured's future workers' compensation premiums;

"Whether the workers' compensation insurance company did or did not reject the advice of its own attorneys or agents;

"Whether the workers' compensation insurance company did or did not communicate with the insured concerning the administration or settlement of a workers' compensation claim or claims;

"Whether the workers' compensation insurance company did or did not set a reasonable reserve on the workers' compensation claim file or claim files that it was handling on behalf of its insured;

"Whether the workers' compensation insurance company did or did not delay in resolving the workers' compensation claim or claims that were filed against its insured."

SCIF objected to the instruction because it was based on *Security Officers*. The trial court overruled the objection, concluding that the instruction "basically is what [*Security Officers*] has said." We agree with the trial court that the instruction is consistent with case law. (*Security Officers Service, Inc.* v. *State Compensation Ins. Fund, supra*, 17 Cal.App.4th at pp. 897-898 [implied covenant relates to SCIF's "functions of defending, investigating, reserving, and settling claims with good faith regard for their effect upon plaintiff's premiums, as determined under the policy and governing regulations" and a plaintiff's contingent entitlement to dividends, reserve-setting, and unreasonable delays in settling and paying claims]; see also *Walbrook Ins. Co.* v. *Liberty Mutual Ins. Co.* (1992) 5 Cal.App.4th 1445, 1455-1456 [7 Cal.Rptr.2d 513].) The instruction does not set out a standard of strict liability. (See also BAJI No. 12.98, factors to consider in determining whether defendant insurance company acted in good faith in rejecting an offer of settlement.)

SCIF complains that the trial court rejected proposed special instructions that would have informed the jury "that mere negligence does not constitute

bad faith." We note the trial court did give SCIF's proposed special instruction No. 55, which does illustrate this concept.[12] Of course, the evidence supports a conclusion that there was more than "mere negligence" in this case. More to the point, *Tricor* holds that "evidence of negligent mishandling of such claims to [plaintiff's] detriment, if shown as a pattern, clearly would be strong circumstantial evidence that SCIF indeed engaged in the complained of conduct." (*Tricor California, Inc.* v. *State Compensation Ins. Fund, supra,* 30 Cal.App.4th at p. 238.) The trial court properly rejected the other proposed instructions since they misstate the law.[13]

■ In its discussion of the compensatory damage award, SCIF mounts several evidentiary arguments which we now address.

[12]SCIF special instruction No. 55 reads: "A breach of the implied covenant of good faith and fair dealing must involve something beyond the breach of a contractual duty itself and must be the result of unfair dealing rather than mistake in judgment." SCIF stated to the jury: "You'll hear instructions from Judge Satt that a mere difference or a mere mistake in judgment is not bad faith. People disagree all the time. A mistake, a difference of opinion, a different judgment that an individual might have, that isn't bad faith; there has to be something more. The conduct has to be so unreasonable, so without reason, that it is bad faith."

We also note SCIF's special instruction No. 46, given to the jury: "The reasonableness of an insurer's conduct cannot be measured or tested by hindsight. The reasonableness of the conduct of State Fund's claims personnel must be measured at the time those persons were confronted with the factual situation to which they were called upon to respond." SCIF argued to the jury that there merely had been a difference in judgment with respect to its reserve policy.

[13]SCIF's proposed and rejected instruction No. 48 reads: "An insurer's obligation of good faith and fair dealing to its insured means that the insurer must not withhold unreasonably benefits which are due under the insurance policy." Notrica objected that SCIF's proposed instruction No. 48 was too narrow and that the concept of unreasonable withholding of benefits was covered in numerous other instructions. The trial court ultimately rejected it as not consistent with case law, emphasizing that the language was too narrow.

SCIF's proposed and rejected instruction No. 50 reads: "You should not find any breach of the implied covenant of good faith and fair dealing unless there was an unreasonable refusal by State Fund to bestow policy benefits without proper cause." Notrica objected it was argumentative and worded like a directed verdict. The trial court remarked on the similarity of SCIF's proposed instructions Nos. 48 and 50 and refused No. 50.

SCIF's proposed and rejected instruction No. 96 reads: "Mere negligence by an insurer in investigating, ascertaining or failing to ascertain relevant facts regarding a claim is not sufficient to establish a breach of the implied covenant of good faith and fair dealing. Whether an insurer such as State Fund acted in good faith with respect to the handling of any particular claim depends on the circumstances of each individual claim." The trial court rejected it as inconsistent with case law.

SCIF's proposed and rejected instruction No. 62 reads: "A mere mistake in handling a claim is not a breach of the implied covenant of good faith and fair dealing, or 'bad faith.' The conduct must be an unreasonable withholding of contract benefits." Notrica objected that bad faith could involve conduct beyond unreasonably withholding contract benefits. The trial court refused No. 62 but agreed to instruct pursuant to SCIF's proposed instruction No. 55, set out at footnote 12, *ante.*

SCIF argues that the trial court erred in allowing Notrica expert witness Sam Smith to rely upon a publication titled the Weekly Insider and to read excerpts to the jury. We disagree.

Smith testified that in his opinion representations by SCIF sales personnel to prospective insureds that SCIF adjusters were trained and expected to place a "probable value" on a worker's case were inconsistent with the "maximum probable" guideline set out in SCIF's reserving manual. Smith further testified he had relied upon two documents in forming an opinion as to why SCIF had changed its reserving guideline to "maximum probable."

The first document, Smith testified, was a June 6, 1989, SCIF memorandum to its district offices, which reads in part: "At the recent claims managers' conference, State Fund president Jack Webb gave a clear and straightforward message. With the possibility of Workers' Compensation reform looming, we must face the future in a strong financial condition." SCIF raised no objection.

With respect to the second document, Smith testified he had received the October 3, 1988, issue of the Weekly Insider, a publication of the Independent Insurance Agents and Brokers of California, which referred to SCIF's Webb as follows: "Jack Webb, [SCIF] president, said he is increasing retention[s] because he believes the State Fund will need stronger reserves in the future. 'The minimum rate law, the backbone of the successful Workers' Compensation business in California, is at great risk,' said Webb. 'Indeed, it may be abolished. I want to have the cash in—'" At this point, SCIF objected on the grounds of hearsay and lack of foundation. The trial court overruled the objections, expressly referring to an earlier, in-chambers ruling that hearsay based upon documents such as SCIF's reserving manual were proper. Smith continued to read to the jury: " 'I want to have the cash in the bank to administer the State Fund under an open rating system.' " Smith then stated his opinion that "they revised the reserve standards to maximum probable potential in anticipation of California open rating, so they would have more cash in the bank." Smith explained to the jury that "open rating" meant that the rating market was being opened to more competition, a description with which James Neary, an SCIF vice-president and actuary, agreed.[14] The publication itself was not admitted into evidence.

SCIF asserts that the court erred in permitting Smith to rely upon the Weeky Insider, citing Luque v. McLean (1972) 8 Cal.3d 136, 148 [104 Cal.Rptr. 443, 501 P.2d 1163]. Luque is distinguishable. In Luque, a personal

---

[14]Neary would later testify: "It was important to [SCIF] to have adequate reserves at the point we went into open rating."

injury case stemming from the use of a defective lawnmower, the trial court was held to have properly refused to admit into evidence articles from Reader's Digest, Today's Health, and Consumer Bulletin "because none of those periodicals constitute[s] the type of professional technical literature 'that reasonably may be relied upon by an expert in forming an opinion' (Evid. Code, § 801, subd. (b))." (*Id.* at p. 148, fn. omitted.)

In the instant case, the Weekly Insider, for which SCIF has requested judicial notice, is a technical trade publication addressing matters of interest to the workers' compensation insurance industry. The subject issue of the periodical includes an interview with Webb as SCIF's president. Therein Webb explains that SCIF was changing its retention policy to increase its reserve levels in anticipation of an open rating system. Smith brought the article to the attention of the jury as part of his explanation of the basis for his opinion why SCIF had changed its reserve policy to increase its reserve levels as open rating loomed. Experts may rely upon hearsay in forming an opinion and may state the basis for the opinion. (Evid. Code, §§ 801, subd. (b), 802; *Mosesian v. Pennwalt Corp.* (1987) 191 Cal.App.3d 851, 860 [236 Cal.Rptr. 778].)

With regard to SCIF's complaint that Smith read excerpts of the article to the jury, we note that when context is needed to understand what has transpired, the expert may read excerpts of the material relied upon to the jury. (See *West v. Johnson & Johnson Products, Inc.* (1985) 174 Cal.App.3d 831, 861 [220 Cal.Rptr. 437, 59 A.L.R.4th 1].) Given a lay jury, additional material would be expected to be helpful.

Finally, the statements the Weekly Insider attributed to Webb were no different in tenor than those the SCIF internal memorandum attributed to Webb, and the latter were read into the record without objection. There was no error.[15]

■ SCIF next assigns error to the decision of the trial court to grant a motion *in limine* brought by Notrica to bar SCIF from referring to itself as a "nonprofit" entity in what Notrica believed would be a bid for sympathy.

---

[15]On cross-examination, Smith denied he had a "theory" regarding SCIF policy changes. Smith summarized his testimony as follows: "Jack Webb said that he wanted to strengthen the reserves so that they could have cash in the bank. Within four months after that, a memo came out changing or suggesting a change. In June of '89, a second memo came out suggesting a change. And in July '89, the changes were made. And that's all I'm saying, is that those facts are very clear and speak for themselves." Smith testified further on cross-examination, "Yes, I believe that State Fund over-reserves, and I testified that they know that they over-reserve." Smith also testified that Webb's request to cut rates was not necessarily inconsistent with his statements indicating he wanted to strengthen case reserves.

SCIF argues that "Notrica's theory was that SCIF had a financial motive to overreserve and mishandle claims" and therefore SCIF was entitled to produce evidence of its nonprofit status to persuade the jury it had no economic motive. We review the record.

In reaching its decision to grant the motion *in limine*, the trial court made the following comments: "I don't think it's really material to [Notrica's] claim that you've mishandled claims that you're nonprofit. I don't see that [that] has anything to do with it. . . . What the jury is interested in is what were the acts of your people—I don't know who they are—adjusters or whoever they are. Did they do acts that were consistent or inconsistent with good faith dealing with their insureds? That's what's before the jury. [¶] It's not before the jury that the statute [Ins. Code, § 11775] says we're nonprofit, ergo, we have no incentive to do anything. I don't think that's before the jury. . . . The issue before the jury is: What were the acts upon which the plaintiffs are saying they're entitled to damages? You can meet those acts by showing what your people did, what the reserves were. . . . I've read in here that State Comp has put huge reserves on cases. [¶] Whether that's proper or improper, I don't know that. But I think the experts are the people who are going to tell the jury whether or not there was any misconduct because of those actions. Whether or not the statute says it's nonprofit has anything to do with it, I don't think it does."

The trial court next indicated it had no problem with SCIF's calling witnesses to explain why SCIF has reserves and their uses, but the witnesses were to do so without saying "We do it because we're nonprofit."

SCIF's defense case included the following testimony.

SCIF executive vice-president Norm Hansen testified that all SCIF employees are civil servants, and that a sales representative incentive pay program had been tied to volume of sales but not to SCIF's financial performance. Hansen further testified how SCIF differed from private insurers in the state: "[F]irst of all, most private insurance companies are either . . . publicly traded stock companies or are closed stock companies. The State Fund, as I mentioned earlier, is an agency, a public enterprise fund created by the legislature. We're statutorily required to be no more nor less than self-supporting. And any excess monies that we have after expenses and provision for reasonable catastrophe reserve, and enough surplus to pay off our claims, has to be returned to our policyholders. [¶] That's not necessarily the case with private insurers, whose first and foremost obligation would be to their stockholders."

SCIF government relations officer Madden testified she did not know of any SCIF employee who received any kind of additional compensation

because claim reserves were increased, nor did she know of anyone at SCIF who would benefit from any increase in reserves. SCIF expert witness Katherine Linnemann, a workers' compensation claims consultant, testified she could not think of any reason why an insurer would want to have more cash on reserve than was necessary.

Finally, vice-president and actuary James Neary testified that for each policy year, an assessment of the total amount of premium received and the total losses incurred is calculated, and then SCIF devises a plan for returning the "excess profit" to the policyholders. Neary explained further: "State Fund is required by law to be neither more nor less than self-supporting. So we keep what we need for adequate reserves on losses and for what we need to carry as surplus and any excess beyond that is returned to the policyholders." Neary also testified that SCIF employees are salaried and do not share in the profits of the organization.

As the above review demonstrates, the defense that SCIF actually mounted indicated that no SCIF employee had a personal economic motive to increase SCIF reserves. Use of the term "nonprofit" was not necessary to that defense. SCIF's nonprofit status was also irrelevant vis-à-vis Webb's personal vision of and goals for SCIF as its president, his leadership being the stimulus for the change in the reserve guidelines. Furthermore, SCIF counsel again reviewed the history and function of SCIF in argument to the jury, stressing that SCIF had no financial incentive to mistreat its insureds but did have an obligation to injured workers. The trial court did not abuse its discretion in limiting the evidence relating to SCIF's status as a so-called nonprofit entity.

SCIF also asserts the trial court erroneously instructed the jury that SCIF's "purpose and everyday function is indistinguishable from a private corporation." The language is a correct statement of the law. (*Courtesy Ambulance Service* v. *Superior Court, supra,* 8 Cal.App.4th at p. 1516.)

SCIF next asserts that the trial court allowed "rank speculation" that SCIF overreserved the claims of all its insureds by a total of $788 million. SCIF points to testimony by its expert, Michael McMurray, criticizing statistical methods employed by Oakley Van Slyke, Notrica's expert. On cross-examination McMurray testified Van Slyke's reserve estimate for 1987 was $1 billion, 71 million, and that SCIF's actual reserve was published as $1 billion, 57 million, 1.3 percent less than the estimate. McMurray further testified that Van Slyke's estimate for 1988 was off by 2.2 percent; his estimate for 1989, 0.7 percent; his estimate for 1990, 0.1 percent; and for 1991, 2.5 percent. It was the responsibility of the jury to determine what

weight to give Van Slyke's testimony and McMurray's criticisms. (*People* v. *Henderson* (1980) 107 Cal.App.3d 475, 486 [166 Cal.Rptr. 20]; *Box* v. *California Date Growers Assn.* (1976) 57 Cal.App.3d 266, 275 [129 Cal.Rptr. 146].)

■ Finally on the subject of evidence, SCIF asserts that the trial court wrongly allowed Notrica to place evidence of SCIF's financial condition before the jury during the bifurcated liability phase of the trial. We review the record.

Neary testified that SCIF as well as other insurance companies underwent a series of eleven "tests" at the end of 1988, three of those tests "directly addressed the adequacy of reserves," and SCIF had "failed" those three tests. SCIF counsel displayed exhibit No. 390 to the jury using an overhead projector. The exhibit was titled "NAIC [National Association of Insurance Commissioners] Financial Ratio Results 1988" and indicated a document distribution date to SCIF management of May 18, 1989. Neary testified the document had been prepared by SCIF's internal audit department based on NAIC's report of SCIF's test results.

At a sidebar conference, counsel for Notrica stated that if counsel for SCIF continued to display and take testimony regarding exhibit No. 390 data indicating SCIF had failed NAIC reserve tests, SCIF would be opening the door for Notrica's examination of the issue of SCIF's overall surplus. The trial court noted the exhibit indicated that seven of the remaining eight tests dealt with the surplus. Counsel for SCIF argued that the document merely reflected certain ratios and that his only intent was to explore "the one narrow relevant area" of the adequacy of claim reserves as indicated by the three selected ratios.

Counsel for Notrica responded: "[T]he obvious inference that [SCIF] want[s] this jury to draw from this line of questioning is that, 'Hey, we had to do something. NAIC told us that we were not in very good shape, and we really needed to do it, so we're just trying to comply with regulations.' [¶] And I want to be able to then introduce, 'If that's the case, why do they have X-billion dollars or whatever of surplus?' "

Counsel for SCIF argued: "This is just a tabulation of certain ratio results. And we're not trying to open up the financials of State Fund. These are just reported ratios that have to do, as Mr. Neary has testified, with the adequacy of State Fund's reserves. It has nothing to do with the total amount of surplus or what State Fund does with its money." Counsel noted that the "actual amounts upon which the ratios are based are not set forth."

The trial court ruled that if SCIF continued to bring the unfavorable ratio information to the attention of the jury, Notrica would be permitted to cross-examine on the subject of surpluses.

SCIF elicited from Neary the following testimony. The role of the state Insurance Commissioner is to monitor the solvency of insurance companies for the protection of the insureds and injured workers. The NAIC tests listed in exhibit No. 390 were employed to evaluate every workers' compensation insurance company in the United States. Three of the eleven tests specifically addressed injured worker claim reserve adequacy, and those were the tests Neary had previously testified SCIF had failed.[16]

In its cross-examination of Neary, Notrica referred to exhibit Nos. 12 and 17 over the objections of SCIF that the financial information there displayed had been the subject of motions *in limine* and the bifurcation motion and went beyond the scope of direct, and that there was no evidence the reserve ratios it had presented were inaccurate or that the two exhibits were relevant. Notrica argued SCIF had waived any such grounds for exclusion. The trial court overruled SCIF's objections.

Neary testified generally that to his knowledge exhibit No. 12 was accurate.[17] Over further SCIF objections of relevance, lack of foundation, prejudice, and hearsay the trial court allowed exhibit No. 12 into evidence, finding it to be more probative than prejudicial.

---

[16]Much of the remaining direct examination at this point elicited from Neary that the Department of Insurance had conducted a customary three-year audit and evaluation of SCIF in 1991 and had concluded that SCIF's case reserve practices were reasonable and adequate. Notrica elicited on cross-examination that Neary did not know the name of the claims specialist who had provided NAIC the information on which the claim reserve data were based, the number of claims files the specialist had examined, or the location of the three SCIF district offices, out of a total of twenty-one such offices, at which the specialist had evaluated claims files.

[17]Exhibit No. 12 is a February 10, 1989, letter to SCIF program managers from Webb, as president of SCIF, with SCIF's 1988 financial statement attached. The letter reads: "The year 1988 was highlighted by continued growth and financial achievement. Premiums earned were a record $1.77 billion. This was the fifth straight year of growth in excess of 20%. Investment earnings of nearly $297 million represented a very healthy 24.4% increase over the prior year. [¶] The State Fund achieved a loss ratio of 78.43%, including an increase of $100 million to the reserve for incurred but not reported claims (IBNR). . . . Underwriting profit was $101 million, a substantial accomplishment. [¶] Total Assets exceeded $3.8 billion. Policyholders' Surplus increased to $713 million and contributed to a premium to surplus ratio of 2.51:1 at year-end. Dividends Paid achieved a new record of $295 million. [¶] Year end results were substantially improved by the action of Claims Departments in closing a record 8240 disability claims during December. [¶] All State Fund employees should take pride and assurance in the financial strength and results accomplished in 1988."

With regard to exhibit No. 17, Neary testified he had no reason to believe that the statements contained therein were incorrect. The trial court overruled SCIF's objections and admitted the exhibit into evidence.[18]

Notrica also referred to exhibit No. 298, an SCIF 1990 annual financial statement. SCIF objected, referring to its motion *in limine* and asserting that the exhibit was irrelevant and beyond the scope of direct examination of SCIF's Edgar DeSouza, the data processing manager of its home office, who had testified regarding the amount SCIF had paid on the Notrica claims files. Counsel for SCIF stated that DeSouza "never testified about payments versus premium." Counsel for SCIF also objected that the exhibit was hearsay.

Counsel for Notrica stated that exhibit No. 298 was being offered to communicate to the jury that, although SCIF had paid more on its claims files than it had received in premiums, Notrica was no different than SCIF's "normal aggregate situation" and that SCIF made its profits—some $420 million—from investment income. Counsel also argued that the exhibit was admissible without foundation as an official record certified by the State of California.

The trial court indicated it had previously overruled the motion *in limine*. It overruled the balance of the objections, stating it did not think the subject was beyond the scope of direct examination.

DeSouza then testified he was familiar with SCIF-generated financial information. The witness agreed the subject document stated that premiums in 1989 totaled some $1,807 million, but he indicated he could not attest that the number was accurate. DeSouza agreed further that while the document stated SCIF in 1989 had a net underwriting loss of some $20,573,000, it also stated SCIF had received investment income of some $370 million that year. For 1990, the document stated SCIF had a net underwriting loss of some $38

---

[18]Exhibit No. 17 is a May 4, 1989, letter from Webb, as president of SCIF, to SCIF program managers, addressing SCIF's first quarter 1989 financial statement. The letter reads: "State Fund continued to demonstrate strong financial achievement during the first quarter of 1989. Assets reached a new milestone by growing to over $4 billion. Net income increased 64.1%, compared with the first quarter of 1988, and reflected substantial growth in both Underwriting Profit and Investment Earnings. [¶] The loss ratio for the first quarter was 66.21% compared with 76.64% a year ago. Policyholders' Surplus was $781.8 million and is reflected in a premium to surplus ratio of 2.33:1. This is a welcome improvement from the 2.86:1 premium to surplus ratio of a year ago. Our Expense Ratio stands at 13.23% compared to 13.85% one year ago. The loss ratio includes a $15 million increase in IBNR [incurred but not reported claims] and the Expense Ratio includes an $8.2 million addition to Loss Adjustment Expense Reserve. [¶] These results are something we should all take pride in. You have my thanks."

million and a net investment gain of some \$420 million for the year. The trial court admitted the portion of the exhibit containing these figures into evidence over the repeated objections of SCIF.

SCIF asserts on appeal that evidence of its net income, surplus, investment earnings, underwriting profit, and dividends was irrelevant and violated Civil Code section 3295, subdivision (d).[19] The argument is not persuasive.

The purpose behind Civil Code section 3295, which allows bifurcation and preclusion of evidence of a defendant's wealth and profits during the liability phase of trial, is to minimize prejudice prior to the jury's determination of a prima facie case of liability for punitive damages. (*Torres v. Automobile Club of So. California* (1997) 15 Cal.4th 771, 777-778 [63 Cal.Rptr.2d 859, 937 P.2d 290].) However, such evidence is not to be excluded on the basis of prejudice when the information is relevant to liability. (*Rawnsley v. Superior Court* (1986) 183 Cal.App.3d 86, 91-92 [227 Cal.Rptr. 806].) Here, SCIF presented the jury with data and testimony indicating that the NAIC had determined it was in financial difficulty prior to the time SCIF changed its reserving guideline to maximum probable potential cost. This evidence raised the specter of unpaid claims endangering the recovery of injured workers and threatening the peace of mind of insureds. The trial court properly allowed Notrica to bring before the jury evidence of SCIF's overall financial condition to place SCIF's evidence in perspective. (Cf. *King v. Karpe* (1959) 170 Cal.App.2d 344, 350 [338 P.2d 979].)

## IV. *The Injunction*

SCIF contends that the injunction cannot be supported legally or factually. It mounts several arguments.

SCIF reasons that since it is a "public entity," citing *Maxon Industries, Inc. v. State Compensation Ins. Fund, supra,* 16 Cal.App.4th at page 1392, it is not a "person" within the meaning of the Unfair Competition Law and

---

[19]Civil Code section 3295, subdivision (d) reads: "The court shall, on application of any defendant, preclude the admission of evidence of that defendant's profits or financial condition until after the trier of fact returns a verdict for plaintiff awarding actual damages and finds that a defendant is guilty of malice, oppression, or fraud in accordance with Section 3294. Evidence of profit and financial condition shall be admissible only as to the defendant or defendants found to be liable to the plaintiff and to be guilty of malice, oppression, or fraud. Evidence of profit and financial condition shall be presented to the same trier of fact that found for the plaintiff and found one or more defendants guilty of malice, oppression, or fraud."

therefore Business and Professions Code section 17200 is not applicable.[20] SCIF's position is not well taken.

In *Maxon*, a pleading case, this court reversed the judgment of dismissal and held that the immunity from tort liability provided under the California Tort Claims Act (Gov. Code, § 810 et seq.) was not applicable to SCIF. In reaching this result, *Maxon* followed *Courtesy Ambulance* (8 Cal.App.4th at p. 1514), which had concluded that Insurance Code section 11873 excludes SCIF from Tort Claims Act immunities.[21] (*Maxon Industries, Inc.* v. *State Compensation Ins. Fund, supra,* 16 Cal.App.4th at p. 1391.) *Maxon* commented:

"The Fund's position about its liability in tort has not been consistent. In 1979, when the Fund sponsored the legislation which enacted Insurance Code section 11873, it advised the Legislature that the statute would exempt the Fund from the California Tort Claims Act. [Citation.] As the court in *Courtesy Ambulance* observed: '[N]othing in the materials before us suggests that [the Fund] took the paradoxical position that it nevertheless desired to confirm that it *was* covered by the substantive provisions of the law.' [Citation.] It is apparent that the Fund sought to cast itself as a private enterprise rather than a public entity when it sponsored the 1979 legislation. It should be treated that way, receiving both the benefits and the disadvantages of that status.

". . . applying Insurance Code section 11873 according to its terms does not lead to an 'absurd' result. To the contrary, it places the Fund in the same position as other insurers, a position the Fund itself was at pains to urge upon the Legislature and others, and which finds support from the very beginning of the workers' compensation system in this state. [Citation.]

---

[20]Business and Professions Code section 17200 reads: "As used in this chapter, unfair competition shall mean and include any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising. . . ."

[21]Insurance Code section 11873 states: "(a) Except as provided by subdivision (b), the fund shall not be subject to the provisions of the Government Code made applicable to state agencies generally or collectively, unless the section specifically names the fund as an agency to which the provision applies. [¶] (b) The fund shall be subject to the provisions of Chapter 10.3 [state employer-employee relations] (commencing with Section 3512 [purpose]) of Division 4 [public officers and employees] of Title 1 [general] of, and Division 5 [personnel] (commencing with Section 18000 [salaries]) of Title 2 [government of the State of California] of, the Government Code, with the exception of all of the following: [¶] (1) Article 1 [claims for reimbursement] (commencing with Section 19820) and Article 2 [employee awards] (commencing with Section 19823) of Chapter 2 [administration of salaries] of Part 2.6 [personnel administration] of Division 5 of Title 2 of the Government Code. [¶] (2) Sections 19849.2 [accident insurance], 19849.3 [travel expenses], 19849.4 [overtime and travel expenses], and 19849.5 [determination of headquarters] of the Government Code. [¶] (3) Chapter 4.5 [state owned motor vehicles] (commencing with Section 19993.1 [restricted use] of Part 2.6 of Division 5 of Title 2 of the Government Code."

"..........................

"The Fund certainly is a 'public entity.' [Citation.][22] The problem is that the entire act [Insurance Code section 11873] is made up of 'provisions of the Government Code made applicable to state agencies generally or collectively.' As such, under Insurance Code section 11873, it has no application to the Fund absent a specific provision naming the Fund. There is no such provision." (16 Cal.App.4th at pp. 1391-1392.)

In other words, although SCIF is a "public entity," SCIF is to be treated as a private enterprise pursuant to Insurance Code section 11873, legislation that SCIF sponsored.

Public entities have been held to be "persons" in other contexts as well. (*City of Los Angeles* v. *City of San Fernando* (1975) 14 Cal.3d 199, 276-277 [123 Cal.Rptr. 1, 537 P.2d 1250] [defendant public entities are "persons" under adverse possession statute when water rights of another public entity are at issue and defendants' sovereign governmental powers are not infringed]; *Regents of University of California* v. *Superior Court* (1976) 17 Cal.3d 533, 536-537 [131 Cal.Rptr. 228, 551 P.2d 844] [university was "person" under usury law with respect to its lending and investment policies, and no sovereign powers involved]; *Community Memorial Hospital* v. *County of Ventura* (1996) 50 Cal.App.4th 199, 210 [56 Cal.Rptr.2d 732] [how public hospital operates is simply the means by which it implements its sovereign power to guard the public health].)

SCIF, however, claims that *Santa Monica Rent Control Bd.* v. *Bluvshtein* (1991) 230 Cal.App.3d 308 [281 Cal.Rptr. 298] (*Bluvshtein*) supports its position. *Bluvshtein* is difficult to apply. In that case, the rent control board, created by city charter to administer and enforce the city's rent control law, sought injunctive relief under the Unfair Practices Act (Bus. & Prof. Code, § 17000 et seq.) against owners of a residential building who had ceased operating the property as a residential rental property, evicted the tenants, and occupied the units themselves pursuant to an oral agreement. The trial court sustained the defendants' demurrer to the three causes of action without leave to amend and dismissed the case. Of interest here is the reviewing court's treatment of the third cause of action.

---

[22]Government Code section 810 reads: "Unless the provision or context otherwise requires, the definitions contained in this part govern the construction of this division."

Government Code section 811.2 states that the term "public entity" includes "the State, the Regents of the University of California, a county, city, district, public authority, public agency, and any other political subdivision or public corporation in the State."

The third cause of action alleged unfair business practices in the form of violations of several laws.[23] Plaintiff rent control board sought an injunction to compel compliance. Apparently, the board had relied upon Business and Professions Code section 17000 et seq., the Unfair *Practices* Act, as a basis for its action but had brought the case as a "person" under Business and Professions Code section 17204 (230 Cal.App.3d at pp. 311, 312-313), a part of what has come to be known as the Unfair *Competition* Law, Business and Professions Code section 17200 et seq., a separate and independent legislative scheme focusing on the redress of unlawful, unfair, or fraudulent business acts or practices (*Stop Youth Addiction, Inc.* v. *Lucky Stores, Inc.* (1998) 17 Cal.4th 553, 570 [71 Cal.Rptr.2d 731, 950 P.2d 1086]). The trial court ruled with respect to the third cause of action that "[n]o cause of action was or could be stated." (230 Cal.App.3d at p. 313.)

In its affirmance, the *Bluvshtein* court also refers to the Unfair Practices Act (Bus. & Prof. Code, § 17000 et seq.), although analyzing sections of the Unfair Competition Law (Bus. & Prof. Code, § 17200 et seq.).[24]

The *Bluvshtein* court first quotes Business and Professions Code section 17204 of the Unfair Competition Law, which provided at that time: "Actions for injunction pursuant to this chapter [5] may be prosecuted by the Attorney General or any district attorney or any city attorney of a city having a population in excess of 750,000, and, with the consent of the district attorney, by a city prosecutor in any city or city and county having a full-time city prosecutor in the name of the people of the State of California upon their own complaint or upon the complaint of any board, officer, person, corporation or association or by any person acting for the interests of itself, its members, or the general public."[25] (Added by Stats. 1977, ch. 299, § 1, p. 1202; 230 Cal.App.3d at p. 318.)

---

[23]The Ellis Act (Gov. Code, § 7060 et seq.); the Subdivision Map Act (Gov. Code, § 66410 et seq.); the Subdivided Lands Act (Bus. & Prof. Code, § 11000 et seq.); Santa Monica Rent Control Law, as expressed in the city charter and rent control board regulations; and the Santa Monica Municipal Code.

[24]The Unfair Practices Act, Business and Professions Code section 17000 et seq., "chiefly prohibits selling articles *below cost*, or giving them away, for the purpose of injuring competitors and destroying competition, except in such cases as 'seasonal clearances'; and it also prohibits *rebates* or special privileges to purchasers which have such purpose and tendency." (1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, § 591, p. 534.)

With respect to the Unfair Competition Law (Bus. & Prof. Code, § 17200 et seq.), the California Supreme Court states that the Legislature intended the sweeping language of " 'any unlawful, unfair, or fraudulent business act or practice' " to include " ' " 'anything that can properly be called a business practice and that at the same time is forbidden by law. [Citations.]' " ' " (*Stop Youth Addiction, Inc.* v. *Lucky Stores, Inc., supra,* 17 Cal.4th at p. 560.)

[25]The comparable provision under the Unfair Practices Act is found in Business and Professions Code section 17070: "Any person or trade association may bring an action to

The *Bluvshtein* court next references the definition of "person" as set forth in Business and Professions Code section 17201 of the Unfair Competition Law: "As used in this chapter [5], the term person shall mean and include natural persons, corporations, firms, partnerships, joint stock companies, associations and other organizations of persons."[26] (Added by Stats. 1977, ch. 299, § 1, p. 1202.)

The *Bluvshtein* court states without further discussion: "[Board] is a government agency; it is none of the things included in the definition of person. Therefore, it has no standing to bring an action for an injunction pursuant to the Unfair Practices Act [(Bus. & Prof. Code § 17000 et seq.)], and the demurer to the third cause of action was properly sustained." (230 Cal.App.3d at p. 318.) No case has followed *Bluvshtein*.

Aside from the problematical holding of *Bluvshtein*, however, there is a fundamental factual distinction between that case and the one at bar: in *Bluvshtein*, the board sought to prosecute the case under Business and Professions Code section 17204; here, Notrica is prosecuting the case. SCIF does not argue that Notrica does not have standing under Business and Professions Codes sections 17201 and 17204.[27] Given that SCIF "may transact workers' compensation insurance required or authorized by law of this state to the same extent as any other insurer" (Ins. Code, § 11778), that it may "[s]ue and be sued in all actions arising out of any act or omission in connection with its business or affairs" (Ins. Code, § 11783, subd. (a)), the expansive scope of the Unfair Competition Law (*Stop Youth Addiction, Inc.* v. *Lucky Stores, Inc., supra,* 17 Cal.4th at pp. 570-571), and the breadth of the definition of *person* provided by Business and Professions Code section

enjoin and restrain any violation of this chapter [4] and, in addition thereto, for the recovery of damages." (Added by Stats. 1941, ch. 526, § 1, p. 1843.)

[26]Under the Unfair Practices Act, Business and Professions Code section 17020 limits the definitions that follow to construction of the act, chapter 4. Section 17021 defines "person" as "any person, firm, association, organization, partnership, business trust, company, corporation or municipal or other public corporation." (Both sections added by Stats. 1941, ch. 526, § 1, pp. 1834-1846.)

[27]Recent amendments to Business and Professions Code section 17204 are not substantive: "Actions for *any relief* pursuant to this chapter *shall* be prosecuted *exclusively in a court of competent jurisdiction* by the Attorney General or any district attorney or by any county counsel authorized by agreement with the district attorney in actions involving violation of a county ordinance, or any city attorney of a city, or city and county, having a population in excess of 750,000, and, with the consent of the district attorney, by a city prosecutor in any city having a full-time city prosecutor or, with the consent of the district attorney, by a city attorney in any city and county in the name of the people of the State of California upon their own complaint or upon the complaint of any board, officer, person, corporation or association or by any person acting for the interests of itself, its members or the general public." (Italics added, Stats. 1992, ch. 385, § 1, p. 1475; Stats. 1993, ch. 926, § 2.)

17201 ("natural persons, corporations, firms, partnerships, joint stock companies, associations and other organizations of persons"), we conclude that SCIF cannot avoid the judgment of injunction on the ground that it does not qualify as a "person" within the meaning of the applicable legislation.

SCIF next argues that Business and Professions Code section 17200 does not apply because it did not engage in "unfair" business practices. SCIF does not refer to a statement of decision.

The judgment states the trial court found SCIF "has engaged in unfair business practices in violation of the statute." Substantial evidence of SCIF's activities, reviewed above, amply supports the finding.

SCIF next argues the injunction is "overreaching, unnecessary, and unworkable." We disagree.

In the first part of the three-part injunction, the trial court ordered SCIF to delete the phrase "maximum probable potential" from its claims manuals, cease training its claims personnel to effect that guideline, and return to the immediately preceding practice. SCIF revisits its micromanagement argument. None of SCIF's criticisms are applicable.

Second, SCIF is enjoined from denying all of its insureds access to workers' compensation claims files in SCIF's possession, pursuant to Labor Code section 3762 (fn. 11, *ante*). The reviews are to take place whether the insured is present or not present. The reviews are to take place at the appropriate SCIF district office upon the insured's request, or at other mutually agreed-upon locations. SCIF is not required to produce any document that it is prohibited from disclosing to the employer under any applicable privilege or statutory prohibition, expressly referencing the attorney-client privilege and Insurance Code section 1877.4. SCIF asserts that Labor Code section 3762 is sufficient and that the injunctive relief is unnecessary. To the contrary, the injunction assures that SCIF will afford appropriate access to those of its insureds in existence before the effective date of the Labor Code section.

Third, the trial court enjoins SCIF from *refusing* to communicate directly with an insured's authorized representative. In response, SCIF claims that "enforcement would require an inordinate amount of trial court supervision" and asks: "Is SCIF to be hauled into court every time an adjuster fails to promptly return a phone call or forgets to respond to a letter?" Posing what amounts to a "parade of horrors" is not a compelling argument. On its face, there is nothing irrational about allowing insureds to be represented by

agents. (See, e.g., *Consumers Union of U.S., Inc.* v. *Alta-Dena Certified Dairy* (1992) 4 Cal.App.4th 963, 972-973 [6 Cal.Rptr.2d 193] [breadth of injunctive powers].) If SCIF comes to believe that the application of the injunction is too onerous, it may move for modification.

Finally in this section, SCIF references the finding of the trial court that SCIF had "engaged in unfair business practices in violation of the statute." SCIF argues that Business and Professions Code section 17200 is unconstitutionally vague *as applied to SCIF* because the term *unfair* has been variously defined in section 17200 cases over the last several decades. The argument is not persuasive.

Business and Professions Code section 17200 presently reads: "As used in this chapter, unfair competition shall mean and include *any* unlawful, unfair or fraudulent business *act or* practice and unfair, deceptive, untrue or misleading advertising and [deceptive advertising at section 17500 et seq.]." (Italics added.) Except for the addition of the italicized words, which were added under the 1992 amendment (Stats. 1992, ch. 430, § 2, p. 1707), the language of this section has not changed since it was added to the code in 1977 (Stats. 1977, ch. 299, § 1, p. 1202). The California Supreme Court, expressly referring to the 1992 amendment, recently stated that "whenever the Legislature has acted to amend the [Unfair Competition Law], it has done so only to *expand* its scope, never to narrow it." (*Stop Youth Addiction, Inc.* v. *Lucky Stores, Inc., supra,* 17 Cal.4th at p. 570.) Given the breadth of the language of section 17200 and the intent of the Legislature, the definition of what is *unfair* must vary with the facts of each case. (See, e.g., *People* ex rel. *Mosk* v. *National Research Co. of Cal.* (1962) 201 Cal.App.2d 765, 771-773 [20 Cal.Rptr. 516].) In the instant case, the test "whether the public is likely to be deceived" (*id.* at p. 772; *Ford Dealers Assn.* v. *Department of Motor Vehicles* (1982) 32 Cal.3d 347, 367-369 [185 Cal.Rptr. 453, 650 P.2d 328]) is applicable to SCIF. SCIF intended to mask its change in reserve guideline to maximum probable potential cost, and it succeeded. Notrica presented evidence that it would not have continued its relationship with SCIF had it been aware of the change.

## V. *The Punitive Damages Award*

■ SCIF mounts several arguments in support of its contention that the punitive damages award must be reversed.

### A. *Notrica's Fraud Claim*

SCIF argues Notrica failed to substantiate its fraud claim, asserting that Notrica did not establish the intentional concealment and intentional injury

elements of Civil Code section 3294. That section provides as pertinent: " 'Fraud' means an intentional misrepresentation, deceit, or concealment of a material fact known to the defendant with the intention on the part of the defendant of thereby depriving a person of property or legal rights or otherwise causing injury." (Civ. Code, § 3294, subd. (c)(3).) The record does not support SCIF's position.

We first address the issue of concealment of a material fact. SCIF's July 1, 1989, internal "Authorized Procedure" manual introduced the "maximum probable potential cost" guideline for claim reserving. SCIF trained its sales force to avoid communicating the "maximum probable potential cost" guideline to its existing and potential insureds.[28] The SCIF sales training manual was one of the documents Notrica expert witness Smith relied upon in forming his opinion that SCIF knew it was over-reserving and was misinforming prospective insureds who asked about the issue. Ignorant of the guideline change, Notrica again contracted with SCIF. Because Notrica and SCIF previously had operated under a different guideline, SCIF had a duty to disclose and explain "maximum probable potential cost" and not to mislead Notrica into believing there had been no change. (*Goodman* v. *Kennedy* (1976) 18 Cal.3d 335, 347 [134 Cal.Rptr. 375, 556 P.2d 737]; *Warner Constr. Corp.* v. *City of Los Angeles* (1970) 2 Cal.3d 285, 294 [85 Cal.Rptr. 444, 466 P.2d 996]; *Eddy* v. *Sharp* (1988) 199 Cal.App.3d 858, 864-865 [245 Cal.Rptr. 211]; *Stare* v. *Tate* (1971) 21 Cal.App.3d 432, 438-440 [98 Cal.Rptr. 264]; Ins. Code, § 330.)

---

[28]SCIF's "Sales Techniques" document provides that when a potential customer indicates an understanding that SCIF over-reserves, there are four responses, including: "Let's look at that based on the way you estimate your costs. As a business person, you look very hard at each item you're thinking of purchasing for the next year, and try to assign an actual, realistic value to it. Our claims people look at a claim the same way. They know they aren't doing you any favors by putting a low and inaccurate estimate on a case. They're trained and expected to place a probable value on a case that will match up at the end of the claim, like you will do with your cost estimates. That's not over-reserving—that's just good business. [¶] What would happen if you budgeted your paper supplies at 1975 prices? You would probably end up having to dip into your assets to make up the budget discrepancy at the end of the year. The same is true on cases that are under-reserved, except that the company dips into your potential dividend."

At trial SCIF had objected, inter alia, that this document was undated, and it raises this issue again in its reply brief. The trial court overruled the objection after learning at a sidebar conference that the document had been produced in response Notrica's April 12, 1991, discovery demand No. 5, question No. 73 for "a copy of State Fund's training manual or other training documents given by State Fund to their . . . sales representatives, account executives, and sales managers, from January 1, 1986, to the present." Ultimately, SCIF had produced the document along with its training manual and claims estimating manual. Notrica expert witness Smith testified that a document designated as "Unit 4," describing SCIF's "interactive instructional system," bore a date of December 1, 1988, and that the "Sales Techniques" manual had been designated as "Unit 5." Smith had concluded that the Sales Technique manual had been created sometime from December 1, 1988, forward.

With respect to the issue of intentional injury, the evidence established that SCIF management and sales personnel understood that a rise in the reserves associated with an employer's workers' compensation cases would lead to an increase in that employer's future premiums, a factor potential insureds would want to consider before purchasing a policy. Notrica's premiums increased as a result of the changed guideline. This evidence supports a finding of intent to injure, since "[e]vidence establishing 'conscious disregard of another's rights' is evidence indicating that the defendant was aware of the probable consequences of his or her acts and willfully and deliberately failed to avoid those consequences. [Citations.]" (*J.R. Norton Co. v. General Teamsters, Warehousemen & Helpers Union* (1989) 208 Cal.App.3d 430, 444 [256 Cal.Rptr. 246]; see also *Schroeder* v. *Auto Driveaway Co.* (1974) 11 Cal.3d 908, 922 [114 Cal.Rptr. 622, 523 P.2d 662].) The purported rationalization of SCIF management that the stronger reserve position would benefit employers and injured employees in the long run did not neutralize the intent element.

### B. *Punitive Damages in the "Abstract"*

SCIF states the rule that punitive damages "must be tied to oppression, fraud or malice *in the conduct which gave rise to liability in the case.*" (*Medo* v. *Superior Court* (1988) 205 Cal.App.3d 64, 68 [251 Cal.Rptr. 924].)

The trial court instructed the jury with a modified BAJI No. 14.72.1 at SCIF's request. "If you find that Notrica suffered actual injury, harm or damage caused by a breach of the covenant of good faith and fair dealing, you must decide in addition whether by clear and convincing evidence you find that there was oppression, malice or fraud in the conduct on which you base your finding of liability. [¶] . . . [¶] 'Fraud' means an intentional misrepresentation, deceit, or concealment of a material fact known to State Fund with the intention on the part of State Fund of thereby depriving a person of property or legal rights or otherwise causing injury."

SCIF asserts that the punitive damages in this case were recovered in the "abstract." The argument is that the compensatory damages were based on SCIF's bad faith claims handling, reserving, and corporate policies but the punitive damages were based on fraud. Thus, SCIF argues, the compensatory award and the punitive damages award were based on "entirely *different* conduct." We disagree.

SCIF's error is in urging that the "fraud" within Civil Code section 3294 be conjoint with a finding of compensatory damages based upon a legal theory of fraud. That position is incorrect. All that is required is that the

fraud must equate to the conduct which gives rise to liability—in this case bad faith. (*Pistorius* v. *Prudential Insurance Co.* (1981) 123 Cal.App.3d 541, 555-556 [176 Cal.Rptr. 660].) The evidence does support such a connection, as summarized in the argument of counsel for Notrica.

Notrica's counsel read question No. 4 of the special verdict in his opening argument to the jury: "In breaching the duty of good faith and fair dealing, do you find by clear and convincing evidence that State Fund acted with malice, fraud or oppression in the conduct?" Counsel explained that it was the plaintiff's burden to establish clearly and convincingly that SCIF had engaged in conduct that was malicious or fraudulent or oppressive. Counsel argued Notrica had shown repeatedly "how State Fund concealed its policies from its policy holders, how they failed to tell its insureds about maximum probable; how they were duplicitous and how they lied to their insureds and covered up." Counsel asserted that such concealment was fraud. Counsel informed the jurors that if they answered yes to question No. 4 there would be a brief punitive damages trial wherein Notrica would argue that SCIF should be punished for its wrong conduct to deter it from treating insureds again in this manner. Counsel also stated: "You just heard State Fund's own witness say that over two years, Notrica's paid over four hundred and some-odd thousand dollars in premium. That's a lot of money to get this type of service. To get your reserves increased. To have . . . your own claim files withheld from you, where you have no access."

In counsel's reply argument, he read a fraud instruction to the jury: "Fraud means an intentional misrepresentation, deceit or concealment of a material fact known to the defendant, with the intention on the part of the defendant of thereby depriving a person of property or legal rights or otherwise causing injury." He then told the jury that although SCIF had "done them all," one was sufficient. Counsel represented that SCIF's Neary had agreed that "violation" of three out of the eleven NAIC categories was a material fact and that this fact had been "concealed." Counsel continued: "They concealed the [reserve] standard from everybody; they all admitted it. They concealed the fact that they denied access to their own claim files to their own insureds, and they concealed the fact that they wouldn't deal with third parties. [¶] They didn't conceal one thing. Minimally, they concealed four things."

Counsel's argument clearly established the nexus between the conduct supporting the award of bad faith and SCIF's concealment of those facts. Since evidence of SCIF's conduct of concealment of the material facts of its claims handling and reserving policies supported both awards, there was no error.

### C. Due Process

Relying upon *BMW of North America, Inc.* v. *Gore* (1996) 517 U.S. 559 [116 S.Ct. 1589, 134 L.Ed.2d 809], SCIF contends that the jury's punitive damages award, stemming from its findings of breach of the implied covenant and fraud, violated its right of due process, on the asserted ground that it did not receive fair notice of either the conduct that would subject it to punishment or the severity of the penalty that would be imposed. We disagree.

There was substantial evidence that senior management personnel at SCIF, the insurer of last resort, knew it was over-reserving and intentionally misled prospective insureds regarding how the reserve policy would be implemented. In addition, SCIF's claims handling and control of file access served to obfuscate the impact of the new "maximum probable potential cost" reserve guideline. SCIF management and sales personnel understood that the increase in case reserves would lead to increased future premiums for the affected employers, a factor potential insureds would want to consider before purchasing a policy. Notrica's premiums did increase substantially as a result of the implementation of the new guideline. This conscious disregard of Notrica's rights was fair notice that SCIF's conduct could subject it to punitive damages. (*J.R. Norton Co.* v. *General Teamsters, Warehousemen & Helpers Union, supra,* 208 Cal.App.3d at p. 444.)

### D. Exclusion of Evidence of SCIF's Conduct

SCIF complains that the trial court's exclusion of evidence of its reform efforts requires reversal of the punitive damages award. We review the record.

During the penalty phase, SCIF asked Neary, a member of its executive committee, "Is the executive committee aware of the jury's verdict of yesterday?" Notrica objected that the evidence was irrelevant. The trial court sustained the objection, and SCIF asked for a conference.

In chambers, counsel for SCIF noted that BAJI No. 14.72.2 would instruct the jurors that if they found that punitive damages should be assessed, they must consider a number of factors in arriving at the amount of the award including "to what extent an award is necessary to deter State Fund from engaging in further conduct." He then indicated to the court what he intended to elicit: "So, the line of questioning that I'm getting into—which will be very brief—with Mr. Neary has to do with the need for a deterrent type award. And that's why I'm asking about State Fund's awareness of the verdict and what, if anything, State Fund has already done or would be doing

with respect to the kind of activity that presumably would be deterred if the punitive damages were to be awarded. I think it's essential that this line of questioning be addressed, even though it goes beyond the scope of Mr. Bidart's direct, it is testimony that we could elicit by calling Mr. Neary on our own, which we would do."

The trial court sustained the relevancy objection, stating that to allow the evidence would be opening "a can of worms," the jury had already determined SCIF had engaged in fraudulent conduct, and what remained to be determined was SCIF's net worth to enable the jury to decide the amount of money, if any, that would punish SCIF.

SCIF assigns error to the decision, asserting that the proffered evidence was relevant to the jury's determination of the reprehensibility of SCIF's misconduct and the amount of damages necessary to deter that misconduct in the future. ■ While it is true that the purpose of a punitive damages award is to punish the misconduct *and* to deter further misconduct by the defendant and other potential wrongdoers (*Stevens* v. *Owens-Corning Fiberglas Corp.* (1996) 49 Cal.App.4th 1645, 1658 [57 Cal.Rptr.2d 525]), the proffered evidence related only marginally to the deterrence issue. The fact that the executive committee decided to make changes after learning of the verdict is too little and too late. The only other offer by SCIF was to demonstrate that it was involved in legislation which would compel it to disclose information which it had previously refused to disclose, in contravention of its duties to its insureds. SCIF's theory that its cooperation with the Legislature demonstrated the turning of a new leaf by SCIF is curious at best. The trial court acted well within its discretion under Evidence Code section 352 in determining that such evidence would be more time consuming than probative, i.e., "a can of worms."

### E. *Public Policy*

SCIF asserts it cannot be held liable to its insureds for punitive damages because, inter alia, it is a nonprofit entity that was legislatively created to encourage competition and affordable insurance, and punitive damages awards threaten such goals. Case law has determined that SCIF's position is without merit. (*Courtesy Ambulance Service* v. *Superior Court, supra,* 8 Cal.App.4th at pp. 1511- 1518; *Tricor California, Inc.* v. *State Compensation Ins. Fund, supra,* 30 Cal.App.4th at pp. 237, 241-242; cf. *Egan* v. *Mutual of Omaha Ins. Co., supra,* 24 Cal.3d at pp. 820-821; see also *Security Officers Service, Inc.* v. *State Compensation Ins. Fund, supra,* 17 Cal.App.4th at pp. 892-893.) However, we determine that public policy considerations are relevant in determining whether the amount of punitive damages awarded is excessive. We address that issue in the next section.

### F. *The Amount Awarded*

 Citing guidelines set forth in *Neal* v. *Farmers Ins. Exchange* (1978) 21 Cal.3d 910, 928 [148 Cal.Rptr. 389, 582 P.2d 980], SCIF argues that the amount of punitive damages awarded is excessive. In addressing these issues, the entire record must be viewed in the light most favorable to the judgment, and reversal is appropriate only when " ' " 'the award as a matter of law appears excessive, or where the recovery is so grossly' " ' disproportionate as to raise a presumption that it is the result of passion or prejudice. [Citation.]" (*Neal* v. *Farmers Ins. Exchange, supra,* 21 Cal.3d at p. 928.)

First, SCIF describes the misconduct found by the jury as its "failure to disclose internal corporate policies and the results of solvency tests," which it characterizes as " 'relatively minor' in light of the types of misconduct that will support punitive damages." We disagree. As previously discussed, the conduct upon which the award is premised was fraud perpetrated by an insurer upon an insured, conduct which clearly supports an award of punitive damages. (*Pistorius* v. *Prudential Insurance Co., supra,* 123 Cal.App.3d at p. 556.)

SCIF argues that the ratio of the $20 million punitive damages award to the $478,606 compensatory damages award is greater than 40 to 1, citing several cases in which an award of punitive damages was reversed: *Egan* v. *Mutual of Omaha Ins. Co., supra,* 24 Cal.3d at pages 822-823 (more than 40 times larger than substantial compensatory award and represented 2½ months of defendant's entire income in 1973 and more than 7 months such income in 1974); *Little* v. *Stuyvesant Life Ins. Co.* (1977) 67 Cal.App.3d 451, 469-470 [136 Cal.Rptr. 653] (ratio of 14 to 1 and in excess of 15 percent of the defendant's entire net worth); *Allard* v. *Church of Scientology* (1976) 58 Cal.App.3d 439, 452-453 [129 Cal.Rptr. 797] ($250,000 to $50,000, a 5-to-1 ratio; no discussion of defendant's financial condition).

Focusing solely on the ratio between compensatory damages and punitive damages is not overly significant. "The rule that the exemplary should bear a reasonable relation to the actual damages is only for the purpose of guarding against excess. [Citations.] But these cases also state that there is no fixed ratio by which to determine the proper proportion between the two classes of damages." (*Finney* v. *Lockhart* (1950) 35 Cal.2d 161, 164 [217 P.2d 19] [in defamation case, $2,000 in punitives, $1 award]; see also *Neal* v. *Farmers Ins. Exchange, supra,* 21 Cal.3d at pp. 928-929 [$740,000 punitive damages award and about $10,000 in compensatory damages, a 74-to-1 ratio]; *Downey Savings & Loan Assn.* v. *Ohio Casualty Ins. Co.*

(1987) 189 Cal.App.3d 1072, 1097-1098 [234 Cal.Rptr. 835] [$5 million in punitive damages and $152,983.43 in compensatory damages, a ratio of 32.7 to 1]; *Chodos* v. *Insurance Co. of North America* (1981) 126 Cal.App.3d 86, 90, 103-104 [178 Cal.Rptr. 831] [$200,000 in punitive damages and $5,146.71 in compensatory damages, a ratio of about 40 to 1]; *Wetherbee* v. *United Ins. Co. of America* (1971) 18 Cal.App.3d 266, 270-271 [95 Cal.Rptr. 678] [$200,000 in punitive damages and $1,050 in compensatory damages, a ratio of about 190 to 1].)

The goal is to award an amount of punitive damages that is sufficient to deter the conduct but is not excessive. (*Adams* v. *Murakami* (1991) 54 Cal.3d 105, 111 [284 Cal.Rptr. 318, 813 P.2d 1348]; see also *Neal* v. *Farmers Ins. Exchange, supra,* 21 Cal.3d at pp. 928-929 [one-tenth of 1 percent of defendant's gross assets and less than a week's worth of its net income in 1974; held not excessive].)

 SCIF asserts that the $20 million award was likely the result of passion and prejudice resulting from evidentiary and instructional errors and improper argument by Notrica's counsel, and that the amount bears no relationship to the actual harm suffered by Notrica. While we do not agree with most of SCIF's arguments relating to evidentiary and instructional error and improper argument, we conclude that the amount of the award is excessive as a matter of law.

This case is unique in that SCIF is an agency of the State of California and would be immune from an award of punitive damages but for Insurance Code section 11873. (See our discussion under pt. IV, *ante,* p. 940; *Security Officers Service, Inc.* v. *State Compensation Ins. Fund, supra,* 17 Cal.App.4th at pp. 892-893.) SCIF was created to serve several public interests, including the financial health of small businesses. It is supposed to return excessive reserves to its insureds, one of the failures argued by Notrica's counsel to the jury as a basis for finding bad faith. Thus, by allowing a large punitive damages award to stand in favor of one insured, other SCIF insureds who were meant to benefit from this public entity will be harmed. The record demonstrates that the jury most likely did not fully appreciate the effect an award of punitive damages would have on other insureds.[29]

In closing argument during the punitive phase of trial, Notrica's counsel asserted that $15 million would not be enough to punish SCIF in light of its

[29]Additionally, while the issue was not specifically raised on appeal, there is evidence of other similar actions pending against SCIF by one or more of the other 250,000 insureds. In light of the fact SCIF is a public nonprofit entity, the possibility of additional punitive damages awards may further diminish the ability of SCIF to carry out its public charge. If the issue of punitive damages is retried, the court and the parties will have to consider the unique nature of SCIF in connection with the issue of punitive damages. (See Rest.2d Torts, § 908, com. e, pp. 466-467.)

financial condition. Notrica's counsel also stated: "What disposition will be made of the punitive-damage award in this case, whether to consumer groups, to other employers in the state of California, is not a part of this proceeding. That's not within the instructions." SCIF argues that the "suggestion did not go unheeded" in that the jury asked during deliberations on August 16, 1995: "How will the punitive damages be distributed?" The trial court responded in writing: "You are not to be concerned with the distribution of punitive damages." SCIF asks: "After all the hype, can there be any doubt the jury was not focusing on the *evidence* when it rendered its $20 million award?"

There is support for SCIF's position. Notrica did not produce any evidence, either at trial or in discussions in chambers, that an award of punitive damages would go to other than Notrica. Yet Notrica's counsel strongly suggested to the jury that such an award would be virtually an act of charity by naming two alternative recipients, neither of which included Notrica: "consumer groups" or "*other* employers." Notrica's counsel thereby implied that Notrica would not benefit in any way from any such award. At the same time that Notrica's counsel planted this suggestion, he also stated that the ultimate distribution of such funds was not a concern of the instant proceedings. This disingenuousness, coupled with the assertion that $15 million would not be sufficient to punish SCIF under the circumstances of this case, we believe, improperly appealed to the passions and prejudices of the jury and tended to obscure the fact of the actual damages suffered by Notrica.

In focusing on the facts here, SCIF's undisclosed change in its reserve setting policy resulted in financial losses to Notrica but did not specifically involve health or safety issues, nor was there evidence that the financial losses were sufficient to ruin Notrica, important considerations in reviewing an award of punitive damages. (*BMW of North America, Inc.* v. *Gore, supra,* 517 U.S. at p. 576 [116 S.Ct. at p. 1615].) We do not think that SCIF's net worth is a satisfactory basis for determining the award because SCIF is required to return surpluses to employers as dividends. The payment of dividends raises the question of who is to be punished by the award. The harm done resulted from operating policies determined more than 10 years ago by SCIF administrators who sought to prepare SCIF for a correctly anticipated and drastic change in market conditions, that is, open rating. Unfortunately, Notrica was not given the information it needed to make an informed decision to continue as SCIF's insured, as the jury found, and as a result became an unwilling participant in SCIF's drive for a more secure position in the workers' compensation insurance marketplace.

We suggest that under the circumstances an award of $5 million is not out of line. Although this amount may not be considered by some to be a

"punishment" given SCIF's considerable resources, we believe that this amount does send the necessary message that public service includes SCIF providing its constituents sufficient information to make informed decisions. Again referencing SCIF's considerable resources, $5 million will not significantly impact its ability to distribute dividends to employers who elect to remain with SCIF, or cause it to raise their premiums. The suggested award of $5 million represents about a 10-to-1 ratio of punitive to compensatory damages.

The judgment is reversed with respect to the punitive damages award of $20 million. We remand the matter for a new trial only on the issue of punitive damages unless, within 30 days from remand, Notrica shall file with the clerk of the court and serve upon SCIF a written consent to a reduction of the punitive damages award to the sum of $5 million, in which event the judgment shall be modified to reflect an award of punitive damages in favor of Notrica in that amount and be affirmed in its entirety. (Cf. *Michelson* v. *Hamada* (1994) 29 Cal.App.4th 1566, 1595-1596 [36 Cal.Rptr.2d 343].)

VI. *Attorney Fees*

The trial court awarded $333,319.65 in attorney fees to Notrica on two alternative grounds: Code of Civil Procedure 1021.5 and *Brandt* v. *Superior Court* (1985) 37 Cal.3d 813 [210 Cal.Rptr. 211, 693 P.2d 796]. SCIF first contends that Notrica is not entitled to attorney fees under Code of Civil Procedure section 1021.5 (Section 1021.5), and that any fees should be limited solely to those incurred in prosecuting the Business and Professions Code section 17200 (Section 17200) claim. We conclude that the award was proper.

Section 1021.5 reads: "Upon motion, a court may award attorneys' fees to a successful party against one or more opposing parties in any action which has resulted in the enforcement of an important right affecting the public interest if: (a) a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons, (b) the necessity and financial burden of private enforcement . . . are such as to make the award appropriate, and (c) such fees should not in the interest of justice be paid out of the recovery, if any. With respect to actions involving public entities, this section applies to allowances against, but not in favor of, public entities, . . ."

SCIF argues that Section 1021.5 is not applicable. SCIF asserts that Notrica proved the Section 17200 claim only with respect to itself, leading SCIF to the conclusion that Notrica did not enforce a right of sufficient

strength or societal importance to merit the award. The breadth of the injunction, which affects SCIF's business practices as they relate to some 250,000 employers, belies this theory. (See *Committee to Defend Reproductive Rights* v. *A Free Pregnancy Center* (1991) 229 Cal.App.3d 633, 639-641 [280 Cal.Rptr. 329]; *Midpeninsula Citizens for Fair Housing* v. *Westwood Investors* (1990) 221 Cal.App.3d 1377, 1392, fn. 3 [271 Cal.Rptr. 99]; *Press* v. *Lucky Stores, Inc.* (1983) 34 Cal.3d 311, 321, fn. 11 [193 Cal.Rptr. 900, 667 P.2d 704].)

SCIF next argues that Notrica's recovery should be limited to fees incurred in prosecuting the Section 17200 claim, which SCIF describes as an insignificant part of the case. The authorities SCIF cites (*Greater Westchester Homeowners Assn.* v. *City of Los Angeles* (1979) 26 Cal.3d 86, 104 [160 Cal.Rptr. 733, 603 P.2d 1329]; *Los Angeles Police Protective League* v. *City of Los Angeles* (1986) 188 Cal.App.3d 1, 10 [232 Cal.Rptr. 697]) do not apply. The trial court did not see fit to apportion the fee award, and there is nothing in this case that persuades us that it was "clearly wrong." (*Planned Parenthood* v. *Aakhus* (1993) 14 Cal.App.4th 162, 170 [17 Cal.Rptr.2d 510].)

SCIF argues that Notrica does not satisfy subdivision (b) of Section 1021.5, asserting that its fees were not out of proportion to its individual stake in the litigation. In assessing this ratio, the court must look at the estimated value of the case when the critical litigation decisions were being made, not the actual recovery after trial. (*Beasley* v. *Wells Fargo Bank* (1991) 235 Cal.App.3d 1407, 1414 [1 Cal.Rptr.2d 459].) Notrica alleged in its complaint that it had suffered proximate damages of $100,000 or more, asking leave to allow amendment of the number. This disparity between damages and some $300,000 in attorney fees satisfies the purpose of Section 1021.5 to encourage litigation in the public interest by covering such fees. (235 Cal.App.3d at p. 1414.)

Finally, SCIF argues that the fee award should be paid out of the punitive damages award. Subdivision (c) of Section 1021.5 provides that the fees should not be paid out of the recovery. (See *Beasley* v. *Wells Fargo Bank, supra*, 235 Cal.App.3d at p. 1417, fn. 3.) The jury decided to award punitive damages without regard to the potential attorney fee award. We see no reason to interfere with that decision here.

Because we conclude that the attorney fee award was proper, it is not necessary to discuss the application of *Brandt* v. *Superior Court, supra,* 37 Cal.3d 813.

## DISPOSITION

The judgment with regard to punitive damages is reversed and the matter is remanded for a new trial only on the issue of punitive damages unless, within 30 days from remand, Notrica shall file with the clerk of the court and serve upon SCIF a written consent to a reduction of the punitive damages award to the sum of $5 million, in which event the judgment shall be modified to reflect an award of punitive damages in favor of Notrica in that amount and be affirmed in its entirety. Costs on appeal are awarded to Notrica.

Vogel (C. S.), P. J., and Curry, J., concurred.

A petition for a rehearing was denied April 13, 1999, and appellant's petition for review by the Supreme Court was denied July 14, 1999.