[No. B158885. Second Dist., Div. Four. June 12, 2003.]

JAMES S. HURVITZ et al., Plaintiffs and Appellants, v.
ST. PAUL FIRE AND MARINE INSURANCE COMPANY, Defendant
and Respondent.

**[Opinion certified for partial publication.*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts IV, V, and VI.

920

## COUNSEL

King & Ferlauto, William T. King and Thomas M. Ferlauto for Plaintiffs and Appellants.

Carlson, Calladine & Peterson, Robert M. Peterson, Asim K. Desai and Patrick M. Quigley for Defendant and Respondent.

## OPINION

**CURRY, J.**—Appellants James S. Hurvitz, M.D., and his wife Jackie Hurvitz brought suit against respondent St. Paul Fire and Marine Insurance Company (St. Paul) for (1) bad faith breach of insurance contract based on St. Paul's decision to settle a third party's claims without the Hurvitzes' consent and over their objections and (2) breach of oral settlement agreement. The trial court granted St. Paul's motion for summary judgment, concluding that the Hurvitzes' consent was not required and that no final settlement agreement had been consummated. We hold that where an insurance policy grants to the insurer the "right and duty" to defend any claim or suit for covered injury or damage, including claims and suits that are "groundless, false or fraudulent" and the "right to settle any claim or suit within the available limits of coverage," the insurer need not obtain the insureds' consent prior to settling with a third party even though it leads to the loss of the insureds' potential claim for malicious prosecution, injures their reputation, or impacts their future insurability. We further agree with the trial court that no final settlement agreement was breached, and, therefore, affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

The following are the agreed facts as set forth in the parties' briefs.

### The Insurance Policy

Respondent St. Paul issued a professional office insurance policy package to Dr. Hurvitz effective from January 1, 1997, to January 1, 1998. The package included commercial general liability coverage for bodily injury, property damage, personal injury, and advertising injury. The policy had an advertising injury limit of $500,000. The "advertising injury liability" provision provided: "We'll pay amounts any protected person is legally required to pay as damages for covered advertising injury that: results from the advertising of your products, work or completed work; and is caused by an advertising injury offense committed while this agreement is in effect." The term "advertising" was defined to mean "attracting the attention of others by any means for the purpose of seeking customers or increasing sales or business." The term "advertising injury" was defined to mean "injury, other than bodily injury or personal injury, caused by an advertising injury offense." The term "advertising injury offense" was defined to mean "any of the following offenses: Libel or slander. Making known to any person or organization written or spoken material that belittles the products, work or completed work of others. Making known to any person or organization written or spoken material that violates an individual's right of privacy. Unauthorized taking or use of any advertising idea, material, slogan, style or title of others."

The provision governing the "[r]ight and duty to defend" provided: "We'll have the right and duty to defend any claim or suit for covered injury or damage made or brought against any protected person. We'll do so even if any of the allegations of any such claim or suit are groundless, false or fraudulent. But we have no duty to perform other acts or services. And our duty to defend claims or suits ends when we have used up the limits of coverage that apply with the payment of judgments, settlements or medical expenses. [¶] We'll have the right to investigate any claim or suit to the extent that we believe is proper. We'll also have the right to settle any claim or suit within the available limits of coverage."

### The Hurvitz/Hoefflin Litigation

Appellant Dr. Hurvitz was formerly in business with Dr. Steven Hoefflin. In 1996, Dr. Hurvitz filed suit against Dr. Hoefflin (*Hurvitz v. Hoefflin* (Super. Ct. L.A. County, No. SC043313)) (No. 313). While that case was

pending, four former employees of Dr. Hoefflin threatened to bring a sexual harassment claim against him. Dr. Hoefflin was convinced to settle immediately, and, although no complaint was supposed to be filed, one accidentally was. In addition, a second, more detailed, version of the complaint (hereafter the draft complaint) found its way into the hands of Dr. Hurvitz, who sent it to Bob Woodward of The Washington Post. The Post published a story about the allegations of the draft complaint. The draft complaint contained allegations that Dr. Hoefflin had exposed or ridiculed patients while they were under anesthesia.

As a result of the publication of the allegations of the draft complaint, Dr. Hoefflin filed a complaint for defamation against the Hurvitzes (*Hoefflin v. Hurvitz* (Super. Ct. L.A. County, No. SC049883)) (No. 883). Dr. Hoefflin also filed a cross-complaint in No. 313, the case initiated by Dr. Hurvitz, containing similar allegations of defamation. Dr. Hoefflin then filed a cross-complaint in another action pending between him and the Hurvitzes (*Hurvitz v. Hoefflin* (Super. Ct. L.A. County, No. SC051519)) (No. 519). The defendants in No. 519 included the Hurvitzes and Gregory Smith, one of the attorneys for the employees who had threatened to sue Dr. Hoefflin. In addition to defamation, the cross-complaint in No. 519 alleged conspiracy, promissory fraud, fraud in the inducement, and breach of contract, based on the turning over of the draft complaint to the press.

Finally, Dr. Hoefflin filed yet another complaint against the Hurvitzes (*Hoefflin v. Hurvitz* (Super. Ct. L.A. County, No. SC052602)) (No. 602), this time including one of the settling employees, Kim Moore-Mestas, Smith, and another attorney for the employees, Richard Garrigues. With regard to the Hurvitzes, the complaint in No. 602 alleged that they encouraged Moore-Mestas to breach the confidentiality provision of the employees' settlement agreement. The complaint in No. 602 included defamation claims, but they were brought against Moore-Mestas and the attorneys only. The complaint also included a cause of action for "injunctive relief" seeking to keep all the defendants from "disseminating and discussing false allegations of misconduct by [Dr. Hoefflin] including but not limited to the allegations in the COMPLAINT, as well as the terms of the SETTLEMENT AGREEMENT with various persons, including the media." For reasons that are not entirely clear, this complaint was never served on the Hurvitzes.[1]

*St. Paul's Representation and Settlement*

On February 13, 1998, St. Paul agreed to represent the Hurvitzes in No. 883 (the first independent action for defamation filed by Dr. Hoefflin) under

---

[1]No. 313 and No. 883 were consolidated. The remaining cases, along with two others not involving the Hurvitzes, were deemed related, and counsel was required to coordinate discovery.

a reservation of rights. On September 8, 1998, St. Paul agreed to defend the Hurvitzes against the cross-complaint in No. 313, and the cross-complaint in No. 519. This was also subject to a reservation of rights.

On July 1, 1998, St. Paul declined to represent the Hurvitzes in the other independent lawsuit filed by Dr. Hoefflin, No. 602, on the ground that "[t]he only cause of action against the [Hurvitzes] is for intentional interference with contractual relationships and the final cause of action against all Defendants for injunctive relief"; "[t]he cause of action for interference with contractual relationship does not potentially allege bodily injury, property damage or an occurrence"; "[the claim does not] potentially allege any enumerated tort under the personal injury coverage . . . or any claims for advertising injury"; and "[a]ny potential claims for libel or slander that the facts might describe are being pursued by [Dr.] Hoefflin in a separate action [and] are not potentially alleged here."

The Hurvitzes were initially represented by independent counsel, Thomas M. Ferlauto, and his firm, King & Ferlauto, due to St. Paul's reservation of rights. St. Paul withdrew its reservation of rights on November 29, 1999, and proceeded to appoint Richard Charnley as new defense counsel for the Hurvitzes. The next month, St. Paul sent a letter to Ferlauto in which terms of settlement of both Dr. Hoefflin's claims against the Hurvitzes and the Hurvitzes' potential claims against St. Paul and Dr. Hoefflin were discussed, and the following statement was made: "If you would prefer for St. Paul not to settle the case, and would rather withdraw the tender of this claim for any defense by St. Paul, you, of course, have that right. Please advise us by the end of the day. As long as this case is being tendered to St. Paul and defended by St. Paul, St. Paul may exercise its right to settle the claims against its insured." In April 2000, Mrs. Hurvitz sent a letter stating that she wished to withdraw the tender of all lawsuits that St. Paul had been defending on her behalf.[2] Nevertheless, St. Paul proceeded to settle all of Dr. Hoefflin's claims against it and the Hurvitzes, including the claims against Mrs. Hurvitz and the claims in No. 602, the action which St. Paul had consistently refused to defend.

Under the settlement agreement, Dr. Hoefflin agreed to release the Hurvitzes from all claims of any nature whatsoever and specifically agreed to

---

[2]The matter was not actually settled until spring of the following year. In a letter dated April 14, 2000, counsel for St. Paul stated: "St. Paul cannot consider a policy buyback while [Dr.] Hoefflin's claims against the Hurvitzes are still pending. If the Hurvitzes wish to waive all policy rights by withdrawing tender of [Dr.] Hoefflin's claims, they may do so at any time before finalization of a settlement, by an instrument in writing delivered to this office. However, . . . I don't think withdrawing the tender would necessarily prevent St. Paul from settling the case because St. Paul could still be liable in a direct action after a judgment."

dismiss all four complaints and cross-complaints against the Hurvitzes in exchange for $325,000. The settlement was conditioned on "the dismissal of Dr. Hoefflin's claims [being] effectuated by the court." Dr. Hoefflin agreed that the settlement was "not intended to impair [the Hurvitzes'] prosecution of any and all claims available to [them] against Dr. Hoefflin, and that the prosecution of any and all such claims is in no manner impacted, effected, modified, cancelled, settled, released or waived by way of the release or the dismissal entered pursuant to this settlement." At the hearing in which the settlement was put on the record, both Charnley and Ferluato appeared on behalf of the Hurvitzes to clarify that this was a settlement between Dr. Hoefflin and St. Paul, and that the Hurvitzes objected. The court dismissed Dr. Hoefflin's complaints and cross-complaints against the Hurvitzes in No. 883, No. 313, No. 519, and No. 602.

Counsel for the Hurvitzes also appeared at the hearing challenging whether the settlement between St. Paul and Dr. Hoefflin was in good faith for purposes of Code of Civil Procedure section 877.6.[3] The challenge was brought by the codefendants in No. 602—More-Mestas and the attorneys who had represented her in the sexual harassment lawsuit—to protect their potential right to proceed against the Hurvitzes for indemnity. The challenging parties argued that since St. Paul expressly denied coverage to the Hurvitzes for claims asserted in No. 602, it had no standing to obtain a good faith determination in that case. Counsel for the Hurvitzes informed the court at that time that the Hurvitzes "would like the protection of a good faith determination." Counsel argued, however, that the good faith determination could and should wait until a later time due to his concern that such a determination would impact the Hurvitzes' ability to pursue the underlying lawsuit against St. Paul for wrongfully settling without their consent.

*The Underlying Complaint and Summary Judgment*

After the settlement agreement was finalized, the Hurvitzes filed the underlying complaint against St. Paul. The complaint contained two causes of action—one for breach of the insurance policy, including breach of the implied covenant of good faith and fair dealing, and one for breach of an alleged oral settlement agreement. With respect to the action for breach of the insurance policy, the complaint alleged that St. Paul "prematurely abandoned prospects of a global settlement which would have been beneficial to the [Hurvitzes] in favor of pursing a partial settlement which was favorable to [St. Paul] and not favorable to the [Hurvitzes]." The complaint further alleged that St. Paul attempted to coerce the Hurvitzes into accepting the

---

[3]The transcript of the hearing appears in the record of a related appeal between the parties: *Hurvitz v. St. Paul Fire & Marine Ins. Co.*, B158904.

settlement by refusing to pay invoices of their independent defense counsel. St. Paul's settlement with Dr. Hoefflin allegedly: impaired the Hurvitzes negotiating position; caused injury to their reputation; precluded them from filing a malicious prosecution action against Dr. Hoefflin; provided funds to Dr. Hoefflin to use to finance his defense of the Hurvitzes' lawsuits against him; deprived the Hurvitzes of insurance financing for their continued litigation; and impacted the Hurvitzes' future insurability.

The complaint also alleged breach of a binding settlement agreement with the Hurvitzes. According to the allegations, an oral contract was entered into on or about January 7, 2000, under which St. Paul was to pay the Hurvitzes $80,000 in return for the release of their malicious prosecution claims against Dr. Hoefflin and release of their right to seek reimbursement for defense costs from St. Paul.

St. Paul moved for summary judgment. The moving papers established that the policy gave St. Paul the right to settle claims against the insureds without their consent, that St. Paul settled all of Dr. Hoefflin's claims against the Hurvitzes, and that the settlement did not impair the Hurvitzes' affirmative cross-claims against Dr. Hoefflin.[4]

In the opposition, the Hurvitzes disputed that St. Paul had the right to settle No. 602 because of its denial of tender, or any of the claims against Mrs. Hurvitz. They further contended that settling with Dr. Hoefflin without their consent violated the covenant of good faith and fair dealing because, among other things, it impaired their potential malicious prosecution claim, and that they were entitled to independent counsel during settlement negotiations.

### Trial Court's Order

The trial court granted the motion for summary judgment. The court reasoned that "[t]he policy expressly gave [St. Paul] the right to settle claims within the policy limits and to do so without the consent of the insured" and that therefore "[the Hurvitzes'] dissatisfaction with the terms of the settlement does not give rise to a claim." St. Paul was under no obligation "to litigate every case to a favorable termination to preserve the insured's expectancy of a future claim for malicious prosecution." Concerning Mrs. Hurvitz's attempt to withdraw her tender of defense, the court said that it did not "result in the requirement that [St. Paul] obtain [her] consent to settle"

---

[4]The moving and opposition papers included numerous facts pertinent to the Hurvitzes' second cause of action for breach of settlement agreement. Our discussion of those facts is set forth in a nonpublished portion of this opinion.

because "[t]here is no evidence that [Mrs.] Hurvitz withdrew her demand that St. Paul indemnify her" and that therefore "St. Paul was contractually obligated to pay a settlement or judgment of [Dr.] Hoefflin's claim." The court also expressed the understanding that "[t]he withdrawal of [Mrs. Hurvitz's] tender of defense could not prevent [Dr.] Hoefflin from obtaining a judgment against her and then collecting that judgment from St. Paul. Once [Dr.] Hoefflin sued and St. Paul agreed to provide a defense, [Dr.] Hoefflin's rights against the St. Paul policy vested, so that St. Paul and the Hurvitzes could neither bilaterally nor unilaterally defeat [Dr.] Hoefflin's claims against the policy. Neither the insurer nor the policyholder can cancel or rescind an insurance policy to defeat the rights of third party claimants."

With regard to the cause of action for breach of settlement agreement, the court stated: "The undisputed facts show that [St. Paul] did not agree to [the terms contained in the January 8, 2000, letter] and that the [Hurvitzes] themselves had no knowledge of and certainly did not agree to the settlement terms they are seeking to enforce. The letters presented by [the Hurvitzes] show that there was no 'meetings of the minds' regarding the terms of any oral contract. [¶] [The Hurvitzes have] presented no material disputed facts that would demonstrate that there was a meeting of the minds. Further, it was the clear intention of the parties that the agreement would be in writing before it could be considered completed." Judgment was entered on the court's order, and this appeal followed.

DISCUSSION

I

The Hurvitzes contend that St. Paul wrongfully settled with Dr. Hoefflin over their objection, particularly with regard to No. 602, the case it consistently refused to defend, and the claims asserted against Mrs. Hurvitz since she sent a letter purporting to withdraw her tender of defense.

Preliminarily, we look at whether an indemnitor's settlement of a lawsuit without the consent or participation of the indemnitee does, in fact, bar a later claim for malicious prosecution by the indemnitee—the primary injury purportedly suffered by the Hurvitzes. That was the issue in *Villa v. Cole* (1992) 4 Cal.App.4th 1327 [6 Cal.Rptr.2d 644], a case involving a suit against several Alameda police officers and the City of Alameda (City) brought by a man who had been arrested for drunk and disorderly conduct. The officers were sued both in their official capacities and their individual capacities, and were represented by the City's attorney. The City was bearing all the cost of defense and would have been obligated to pay any

judgment. The arrestee eventually offered to settle in exchange for the City's waiver of its right to seek reimbursement for its litigation costs and attorney fees. One of the officers objected to settlement on those terms, but the City went ahead, taking the position that it had a right to settle the lawsuit on behalf of the recalcitrant officer because it had borne all the expense of his indemnification and defense, and because the settlement would result in the dismissal of the lawsuit with no actual or potential liability to him. After the matter settled, the officer filed a lawsuit for malicious prosecution against the arrestee. Summary judgment was granted on the ground that the settlement prevented the officer from establishing favorable termination of the underlying action in his favor.

In reviewing the trial court's order, the appellate court discussed the basic principles of malicious prosecution law: "[I]n order to establish a cause of action for malicious prosecution a plaintiff must plead and prove that the prior proceeding . . . was: (1) pursued to a legal termination favorable to the plaintiff; (2) brought without probable cause; and (3) initiated with malice. [Citations.] . . . [¶] In order for the termination of the lawsuit to be considered 'favorable' to the malicious prosecution plaintiff, it must be reflective of the merits of the action and of the plaintiff's innocence of the misconduct alleged therein. In most cases, a voluntary unilateral dismissal is considered a termination in favor of the defendant in the underlying action; the same is true of a dismissal for failure to prosecute. [Citations.] [¶] On the other hand, a resolution of the underlying litigation that leaves some doubt as to the defendant's innocence or liability is *not* a favorable termination, and bars that party from bringing a malicious prosecution action against the underlying plaintiff. Thus, a dismissal resulting from negotiation, settlement or agreement is generally not deemed a favorable termination of the proceedings. [Citations.] The purpose of a settlement is to *avoid* a determination on the merits." (*Villa v. Cole, supra,* 4 Cal.App.4th at pp. 1335-1336.)

The officer contended that because the underlying lawsuit was settled over his protests and objection and because he did not participate in the settlement in any way, it "actually operated as a voluntary unilateral dismissal of himself by [the arrestee], and was thus a favorable termination on the merits." (*Villa v. Cole, supra,* 4 Cal.App.4th at p. 1336.) The court disagreed: "[E]ven where a defendant does not agree to a settlement made on his behalf, his or her dismissal from the lawsuit pursuant to that settlement will not be viewed as a favorable termination as long as it was a necessary condition to achievement of the overall settlement. Such a dismissal is not considered unilateral because it was required by the terms of a settlement agreement, and it will act as a bar to a later malicious prosecution action by the nonsettling defendant." (*Ibid.*) In the case before it, "the terms of the

settlement between the City and [the arrestee] required the dismissal of all the defendants, including [the officer]. The City could not realize the benefits of settling the litigation with [the arrestee] unless the action against [the officer] was simultaneously terminated. Otherwise, the City would continue to be exposed to potential liability on [the officer's] behalf, both for defense and for indemnification, and would therefore still be a participant in the litigation, contrary to its aims in settling with [the arrestee] and his attorney. In short, [the arrestee] dismissed [the officer] from the lawsuit because it was necessary to effect the settlement with the City. Such a termination does not necessarily reflect [the arrestee's] opinion that his action against [the officer] lacked merit, and thus does not qualify as a favorable termination for purposes of a malicious prosecution action." (*Ibid.*)

In reaching its decision, the court relied in part on *Haight v. Handweiler* (1988) 199 Cal.App.3d 85 [244 Cal.Rptr. 488]. In that case, a malicious prosecution action based on an underlying malicious prosecution action, the attorney defendant in the underlying malicious prosecution refused to settle unless the plaintiff also dismissed his former client. The settlement went forward and both were dismissed, but neither the client nor his new attorney agreed to the settlement or authorized the dismissal. Like the officer in *Villa v. Cole, supra,* 4 Cal.App.4th 1327, the client argued that "because he did not agree to the settlement the termination should be treated as a voluntary dismissal of him . . . ." (*Haight v. Handweiler, supra,* 199 Cal.App.3d at p. 89.) The facts were undisputed, however, that the plaintiff in the underlying malicious prosecution action "dismissed [the client] because it was necessary to effect the settlement, . . . because [the former attorney] would not settle without it . . . ." (*Ibid.*) The plaintiff in the underlying malicious prosecution action also believed that the settlement funds represented reasonable compensation for the damage he suffered in the original litigation. On those facts, the court agreed that the dismissal of the client "does not qualify as a favorable termination in the context of a malicious prosecution action." (*Ibid.*)

Based on *Villa v. Cole* and *Haight v. Handweiler,* it appears that the Hurvitzes are correct that the settlement, despite their lack of involvement and outright opposition, deprived them of the favorable termination needed to pursue a later malicious prosecution action against Dr. Hoefflin.

## II

As we have seen, the insurance policy gave St. Paul "the right and duty to defend any claim or suit for covered injury or damage made or brought against any protected person[] . . . even if any of the allegations of any such

claim or suit are groundless, false or fraudulent" and "the right to settle any claim or suit within the available limits of coverage." The Hurvitzes argue that, despite the language of the policy, St. Paul did not have an unfettered right to settle claims without their consent. The Hurvitzes maintain that by settling, St. Paul violated the covenant of good faith and fair dealing because Dr. Hoefflin's claims were meritless, and the settlement precluded the possibility of a later claim for malicious prosecution action against Dr. Hoefflin. The Hurvitzes further alleged that the settlement impaired their negotiating position, caused injury to their reputation, provided funds to Dr. Hoefflin to use to finance his defense of the Hurvitzes' lawsuits against him, deprived the Hurvitzes of insurance financing for their continued litigation, and impacted their future insurability.

Similar allegations were before the court in *Western Polymer Technology, Inc. v. Reliance Ins. Co.* (1995) 32 Cal.App.4th 14 [38 Cal.Rptr.2d 78], where the plaintiffs, a company and its owner, alleged that the settlement of a third party claim by their insurer "injured their reputations and damaged [plaintiff company's] ability to recover on its cross-complaint against the third parties." (*Id.* at p. 18.) The plaintiff company had been sued by a third party for allegedly delivering defective manufacturing equipment, and had cross-claimed for amounts due under a note and for misrepresentation. After expending over $500,000 in defense costs, the insurer settled within policy limits under an agreement that left the cross-claims intact. Putting a reverse spin on the numerous cases which have held that an insurer acts in bad faith when it unreasonably *refuses* to settle a case within policy limits and thus exposes its insured to a judgment far beyond policy limits, the plaintiffs argued that an insurer engages in bad faith conduct when it *accepts* a settlement over the insured's objection where there is no likelihood that the insured would be exposed to a judgment that exceeded the policy's limits. (*Id.* at p. 23.)

The court refused to "accept [the plaintiffs'] indiscriminate transfer of rules that address one problem—insurers which wrongfully expose their insureds to excess liability by unreasonably refusing settlements—to a context completely foreign to the rules' origins." (*Western Polymer Technology, Inc. v. Reliance Ins. Co., supra,* 32 Cal.App.4th at p. 23.) Instead, it "use[d] fundamental principles that govern claimed breaches of the implied covenant of good faith and fair dealing" to analyze plaintiffs' claim. (*Ibid.*) Under this analysis, it was clear that the interests plaintiffs claimed were impaired could not be protected by the implied covenant of good faith and fair dealing, given the purpose of liability insurance and the express language of the policy: "[Plaintiff company] contends that the settlement injured its business reputation. However, a liability insurance policy's purpose is to provide the

insured with a defense and indemnification for third party claims within the scope of the coverage purchased, and not to insure the entire range of the insured's well-being. [Citation.] At least where the policy does not require the insured's consent to a settlement, there appears to be no precedent for holding an insurer liable for injury to an insured's reputation as a result of the settlement of a third party claim. [Citation.] This is not surprising, because the policy language informs the insured that the insurer may settle 'as it deems expedient' any claim or suit, even if the suit's allegations are 'groundless, false or fraudulent . . . .' No reasonable reading of this language would create an expectation that the insurer has to forgo settlement in favor of vindicating the insured's reputation." (*Id.* at p. 27.) As the court saw it, adopting the plaintiffs' argument would mean that insurers could never settle without the insured's consent even where the contract stated otherwise, and result in "a judicial fiat excising insurers' contractual right to control settlements . . . ." (*Id.* at p. 28; accord, *New Hampshire Ins. Co. v. Ridout Roofing Co.* (1998) 68 Cal.App.4th 495, 504, 505 [80 Cal.Rptr.2d 286] [stating that where the policy "gave the insurer the express right to settle claims and, if such settlements included the insured's deductible, to thereafter seek reimbursement from the insured," the insured's exercise of that right could not be limited by the implied covenant of good faith and fair dealing because "the implied covenant cannot be utilized to limit or restrict an express grant of discretion in a contract to one of the parties thereto"]; see *Caplan v. Fellheimer Eichen Braverman & Kaskey* (3d Cir. 1995) 68 F.3d 828, 839 [where insured sought an injunction to prevent the insurer from settling with a third party because the settlement would preclude a later malicious prosecution action, court held that because they contracted with the insurer to authorize it to settle claim and thereby "acted to permit the outcome which they find unacceptable," the outcome complained of was "self-inflicted" and "does not qualify as irreparable [injury]"].)

Although the Hurvitzes' alleged injuries are somewhat different than those described in *Western Polymer*, we believe the court's analysis is equally applicable here.[5] The decision to settle rather than continue litigation invariably involves a conflict between the desire to vindicate oneself and the desire to minimize the costs of litigation and avoid the risk of loss. Defendants who settle face an uphill battle in convincing others, including members of the interested public or the media, that they were completely innocent of the charges. Moreover, when a defendant pays money or gives up something

---

[5]Plaintiffs in *Western Polymer* claimed that there was an impact on future insurability and that the settlement created a war chest for the third party, but the court did not believe those factors were properly before it. (*Western Polymer Technology, Inc. v. Reliance Ins. Co., supra,* 32 Cal.App.4th at p. 27, fns. 8 & 9.) The Hurvitzes included these types of allegations in their complaint.

of value to settle a claim, he or she loses the ability to later pursue a malicious prosecution claim. (See, e.g., *Ferreira v. Gray, Cary, Ware & Freidenrich* (2001) 87 Cal.App.4th 409, 414 [104 Cal.Rptr.2d 683] ["a negotiated settlement . . . is entirely inconsistent with bringing a further lawsuit for malicious prosecution"].) These are the ordinary consequences of settlement. A party purchasing a liability insurance policy containing the duty to defend language at issue here agrees to accept the insurer's view concerning the point at which the benefits of settlement exceed the risk of continuing litigation. The alternative is to negotiate—and pay for—a policy with a consent provision. Liability insurance exists primarily to protect the insured's finances. The covenant of good faith and fair dealing requires the insurer to minimize the possibility of an award that exceeds the policy's limits—it does not require the insurer to fight a legal action until the bitter end when the costs of defense exceed the benefit to be achieved.

We find further support for our conclusion in *New Plumbing Contractors, Inc. v. Edwards, Sooy & Byron* (2002) 99 Cal.App.4th 799 [121 Cal.Rptr.2d 472], where the insured sued not its insurer, but the insurer's counsel, alleging professional negligence and breach of fiduciary duty for settling an earlier action without notifying the insured and "ignoring valid defenses that would have absolved [the insured] of any liability." (*Id.* at p. 801.) The damages were said to be "higher premiums, . . . lower coverage and higher deductibles," as well as the need to deal with "financially weaker carriers . . . ." (*Ibid.*) The trial court ruled that "the insurer had the right to settle the case regardless of whether it was defensible, and without consulting its insured." (*Id.* at pp. 801-802.) The appellate court agreed: "Under a policy provision giving an insurance company discretion to settle as it sees fit, the insurer is 'entitled to control settlement negotiations without interference from the insured,' and generally, it has no liability to the insured for settling within the policy limits. [Citation.] Thus, there is no cause of action where the insured claims the settlement injured its business reputation [citation], nor any where the insured claims the settlement unfairly used up its deductibles. [Citation.] . . . [¶] Since [the insurer] could settle without consulting [the insured] and over its objection, counsel's recommendation of settlement was not a cause of any harm the [insured] may have suffered." (*Id.* at p. 802.)

The Hurvitzes cite a case with similar facts that came to a dissimilar conclusion: *Novak v. Low, Ball & Lynch* (1999) 77 Cal.App.4th 278 [91 Cal.Rptr.2d 453]. There the insurer agreed to defend two of the multiple causes of action in a third party complaint under a reservation of rights. Independent counsel was appointed to provide the insured a defense. In the meantime, unbeknownst to the insured or his independent counsel, counsel

for the insurer entered into settlement negotiations with the third party, eventually agreeing to settle the two potentially covered causes of action, allowing the insurer to completely withdraw. As in *New Plumbing Contractors*, the insured brought an action against the attorneys for the insurer, contending that they should have advised the insured and his counsel of settlement negotiations. The claim was dismissed by the trial court, but the Court of Appeal believed there was merit to the allegations because the insured and his attorney might have been able "to impact settlement through the exchange of information or otherwise . . . protect [the insured's] interest in light of the proposed dismissal of the first two causes of action." (*Id.* at p. 285.)

The court gave various examples of ways the insured could have acted to protect himself had he been properly informed, which "[bore] on the factual issues of causation and damages, which remain for determination at trial": "[He] could have attempted to finish discovery prior to settlement, effect a global settlement of the entire action or seek declaratory relief as to whether [the insurer] could withdraw its defense upon a partial settlement. [The insured] has also asserted various ways in which the settlement worked more harm than good, including loss of insurance protection and defense to the remaining causes of action. As well, the settlement provided [the third party] with financing to aggressively prosecute the remaining causes of action. Further, [the insured] contends the first two causes of action were completely devoid of merit, and thus their dismissal precluded pursuit of a suit for malicious prosecution as to those claims." (*Novak v. Low, Ball & Lynch, supra,* 77 Cal.App.4th at p. 285.)

In *Novak*, the harm to the insured arose primarily from the failure to negotiate a *global* settlement that included dismissal of all causes of action against the insured, something that did not occur here. However, to the extent it is supportive of the view that, prior to acceptance of a reasonable settlement within policy limits, an insurer or its counsel must consider the impact of a settlement on an insured's potential claim for malicious prosecution or on the third party's ability to finance continuing litigation, we must respectfully disagree for the reasons we have discussed and the reasons set forth in *Western Polymer* and *New Plumbing Contractors*.

As the Hurvitzes further point out, in other circumstances, courts have held that settlements which eliminate the insureds' rights to obtain recovery for their affirmative claims of injury can result in liability for bad faith. In two cases—*Barney v. Aetna Casualty & Surety Co.* (1986) 185 Cal.App.3d 966 [230 Cal.Rptr. 215], and *Rothtrock v. Ohio Farmers Ins. Co.* (1965) 233

Cal.App.2d 616 [43 Cal.Rptr. 716]—both involving automobile accidents, the insurance companies' settlements with third parties caused the insureds' compulsory cross-claims for personal injuries arising out of the same accidents to be barred. In those cases, the insurers undertook the settlements knowing that the insureds intended to file cross-claims, but before the cross-claims were filed. Had they simply allowed the cross-claims to be filed before the settlement, or carefully worded the settlement agreements to make clear that cross-claims were not precluded—as St. Paul did here with respect to the Hurvitzes' cross-claims against Dr. Hoefflin—the claims could have gone forward. The Hurvitzes suggest no way that St. Paul could have both settled with Dr. Hoefflin and preserved their right to a malicious prosecution action. (See *Villa v. Cole, supra,* 4 Cal.App.4th 1327; *Ferreira v. Gray, Cary, Ware & Freidenrich, supra,* 87 Cal.App.4th at p. 413 ["[W]here both sides give up anything of value in order to end the litigation, a party cannot later claim he received a favorable termination"].)

The Hurvitzes also seek to rely on this court's decision in *Notrica v. State Comp. Ins. Fund* (1999) 70 Cal.App.4th 911 [83 Cal.Rptr.2d 89] for the proposition that the insurer must at least consider the potential impact on the insured's future premiums when it settles a third party lawsuit. In that case, a business sued its workers' compensation carrier, the State Compensation Insurance Fund, for tort recovery based on the insurer's case reserve and claims handling policies and practices. The insurer had a pattern of leaving claims open for excessive periods of time and assigning high monetary reserves to account for their future resolution, thus causing the insured's experience based premiums to be inflated. We followed the decision in *Security Officers Service, Inc. v. State Compensation Ins. Fund* (1993) 17 Cal.App.4th 887 [21 Cal.Rptr.2d 653], in holding that this practice violated the implied covenant of good faith and fair dealing. In *Security Officers Service,* the plaintiff established that claims which had been open for as long as three years, and to which reserves in excess of $100,000 had been assigned, could have been easily resolved for a fraction of the reserve amount. (*Id.* at p. 891.) The insurer argued that a finding that the implied covenant applied in that situation would improperly conflict with its liability to claimants "because [it] would be forced to attune its efforts toward minimizing plaintiff's premiums, as opposed to proper claims determination and payment." (*Id.* at p. 898.) The court in *Security Officers Service* found this conflict to be "a false one"—and we agreed—because "[f]rom the standpoint of diligence and proper reserve-setting, the interests of both [the insured and the claimant] are identical." (*Ibid.*)

The situation here is not at all analogous to that in *Notrica* and *Security Officers Service.* Unlike the plaintiffs in those cases, the Hurvitzes did not

seek to have the claims against them resolved quickly and efficiently, but urged that St. Paul litigate until the bitter end—whatever the cost—in order to maximize the future potential for a successful malicious prosecution claim against Dr. Hoefflin. To hold that the implied covenant requires an insurer to reject a settlement which represents in the Hurvitzes' own words "[an] amount. . . based merely on the cost of defense of the protracted litigation, not any legitimate evaluation of exposure," would create a conflict with the insurers' duty to resolve claims fairly and efficiently.

In the final analysis, the position the Hurvitzes advocate would put insurers in an untenable position. ■ The law requires insurers to settle third party claims whenever they reasonably can, in order to avoid the potential of a judgment that exceeds policy limits. Failure to do so exposes insurers to bad faith tort damages. ■ The Hurvitzes attempted to prevent St. Paul from settling with Dr. Hoefflin, but, notwithstanding their professed expectations of an easy victory, at no time indicated a willingness to give up their right to indemnity from St. Paul if Dr. Hoefflin won a judgment in excess of the proposed settlement. Nor did they agree to give up their right to seek a bad faith recovery against St. Paul if a judgment was obtained against them in excess of policy limits. A rule requiring an insurer to refuse a reasonable settlement merely because the insured hopes to someday prevail in a malicious prosecution action would conflict with the insurer's duty to handle claims efficiently and pay reasonable settlement offers in order to protect the insured from financial ruin caused by an excessive judgment. We see no reason to create a new area of potential bad faith liability for insurers that conflicts with the insurer's well-established duty—particularly since the rule advocated could easily backfire, resulting in more harm than good to the insured.

III

■ The Hurvitzes contend that St. Paul had no right to settle with Dr. Hoefflin on Mrs. Hurvitz's behalf after receipt of the letter withdrawing tender, or represent the couple in any way in No. 602 since it never accepted tender of defense of that case. ■■■ With respect to No. 602, St. Paul rejected tender because the only claims against the Hurvitzes in that specific lawsuit were for interference with contractual relationships and injunctive relief.[6] ■ As we have seen, however, when St. Paul settled with Dr. Hoefflin, it not only obtained a general release of all claims against

---

[6]Had Dr. Hoefflin not chosen to pursue his claims in such a disjointed and fractured manner, it is unlikely that St. Paul could have taken this tack since the rule is that in a "mixed" action, that is one in which some of the claims are at least potentially covered and the other are not, "the insurer has duty to defend the action in its entirety." (*Buss v. Superior*

the Hurvitzes, but also obtained an agreement to dismiss the Hurvitzes in No. 602. In addition, St. Paul sought and obtained a finding that there was a good faith settlement in No. 602 with respect to the claims against the Hurvitzes, shielding them from indemnity claims by codefendants.

One difficulty with the Hurvitzes' attempt to isolate No. 602 as the basis for bad faith actions by St. Paul is that the complaint in that case was never served on them. Consequently, they suffered no appreciable damage as the result of St. Paul's refusal of tender. Moreover, since Dr. Hoefflin's claims against the Hurvitzes all arose out of the same general set of facts, we do not see how St. Paul could have effectively settled the other three lawsuits in a way that fulfilled their good faith obligation to fully protect the Hurvitzes without resolving No. 602. Even if No. 602 had not been specifically mentioned in the settlement agreement, the general release obtained would have ultimately required Dr. Hoefflin to dismiss the Hurvitzes from the case.

More significantly, in asserting St. Paul's "wrongful" settlement of No. 602 as a basis for the underlying bad faith lawsuit, the Hurvitzes overlook that they obtained substantial benefit from the settlement, including a determination under Code of Civil Procedure section 877.6 that the other codefendants in No. 602 could not pursue cross-claims for indemnity. At the section 877.6 hearing, the Hurvitzes did not join the other defendants in contending that St. Paul lacked standing. Instead, they admitted that they desired the protection afforded by the finding that a good faith settlement had been consummated on their behalf. Their objection was based solely on a desire to put off the good faith determination for fear that it would undermine the present bad faith action.

A similar attempt to disavow the burden of an inconvenient settlement while at the same time accept the benefits was before the court in *Villa v. Cole, supra,* 4 Cal.App.4th 1327. The plaintiff police officer, in seeking to pursue a malicious prosecution action against the arrestee despite the City's purported settlement of the entire underlying action, asserted that "the City could not settle on his behalf and could not claim to represent him because

---

*Court* (1997) 16 Cal.4th 35, 48 [65 Cal.Rptr.2d 366, 939 P.2d 766].) The insurer "cannot parse the claims, dividing those that are at least potentially covered from those that are not. To do so would be time consuming. It might also be futile: The 'plasticity of modern pleading' [citation] allows the transformation of claims that are at least potentially covered into claims that are not, and vice versa." (*Id.* at p. 49.) The inherent futility of an attempt to parse covered from noncovered claims can be seen here. Since Dr. Hoefflin's complaints were all based on the same general set of facts, they were deemed related and went forward as one in the trial court. St. Paul's refusal of tender resulted in no obvious benefit or savings to the company.

he never requested such representation." (*Id.* at p. 1336.) The court found the contention to be "without merit" explaining: "A party may not voluntarily accept the benefits of a settlement negotiated and accepted on the party's behalf by an attorney, and at the same time disavow the settlement to the extent it is against his or her perceived interests. [Citations.] [¶] Here, [the officer] accepted all the benefits of the City's representation of him, and of the settlement that terminated the lawsuit against him. He did not express any objection to the fact that the City had assumed all the costs of his defense; he did not offer to reimburse the City for his pro rata share of litigation expenses; and he never offered to hold the City harmless for the costs he would incur in continuing to defend the lawsuit on his own. In short, while accepting the benefits of his dismissal, [the officer] did nothing to set aside or repudiate the settlement of which that dismissal was a part. On this basis, the City clearly could not assume that [the officer] would forego later claiming the right to reimbursement and indemnification from the City for any attorney fees, litigation costs, or damages he incurred in further defense of [the arrestee's] action. In order to protect itself against further litigation, the City was entitled to provide for [the officer's] representation and also to require his dismissal as part of the overall settlement. [The officer] may not now disavow that settlement, having effectively ratified it by accepting its benefits." (*Id.* at p. 1337.)

The situation was somewhat the same in *New Hampshire Ins. Co. v. Ridout Roofing Co., supra,* 68 Cal.App.4th 495, where the insured tendered defense of multiple claims to its insurer and allowed the insurer to pay all the expenses of the litigation, but balked at paying the policy's deductible of $5,000 per occurrence after the claims were settled. In a lawsuit brought by the insurer to recover reimbursement for the deductible, the insured argued, among other things, that the losses were not covered "property damage" losses under the policy. (*Id.* at p. 501.) The court stated: "If, subsequent to its tenders to the insurer and the commencement of the latter's provision of a defense, this insured concluded that, notwithstanding its tender(s), some or all of these claims were in fact not covered by the policy, it could have, among other things (1) so stated via a letter to the insurer and requested the transfer of the defense to its own counsel, (2) so stated in court and requested a substitution of counsel on that basis, (3) filed a declaratory relief action asking for a determination that there was no coverage, etc. What it cannot do, however, is have the best of both worlds, i.e., accept the benefits of the defense provided by the insurer but, when the time comes to effect settlements of the claims (via, in part, its deductibles), then assert a lack of coverage." (*Id.* at p. 507.)

The Hurvitzes likewise seek to have it both ways with regards to No. 602. To the extent any defense in No. 602 was required, it was funded by St. Paul.

The Hurvitzes were more than happy to accept St. Paul's defense funds prior to the settlement as well as the settlement's protection from indemnity cross-claims, but now condemn St. Paul for settling in order to support a bad faith suit. This cannot be countenanced. Having been brought into the Dr. Hoefflin litigation by the Hurvitzes and having provided the defense that they demanded, St. Paul had a right to settle in a way that protected both it and the Hurvitzes from future litigation, and did not engage in bad faith by making the settlement contingent on dismissal of all claims against the Hurvitzes—including a claim it had previously refused to defend.

The principal distinction between the present case and the situation in *Villa* and *New Hampshire* is that, here, Mrs. Hurvitz attempted to formally withdraw her tender of defense by sending a letter to St. Paul which stated that she "wish[ed] to withdraw [her] tender of all lawsuits that St. Paul has been defending [her] against." In seeking to withdraw her tender of defense, however, Mrs. Hurvitz did not state that she would personally finance her share of all future litigation costs without expectation of reimbursement or hold St. Paul harmless for any recovery obtained from her by Dr. Hoefflin. Instead, a major stumbling block precluding the consummation of a three-way settlement was the Hurvitzes' unwillingness to provide an unequivocal policyholder's release to St. Paul. At the time Mrs. Hurvitz was purportedly withdrawing her tender, the Hurvitzes were seeking to negotiate through their counsel either (1) a limited release of claims they might have against St. Paul as a result of St. Paul's handling of the Dr. Hoefflin matters in exchange for a payment of $80,000 or (2) a "buy back" proposal, under which the Hurvitzes would agree to give up all claims against St. Paul under the policy in exchange for a payment of $400,000. Mrs. Hurvitz's attempt to retain her right to sue St. Paul for bad faith breach of contract rendered the purported withdrawal of tender ineffectual. St. Paul had no obligation to refrain from consummating the settlement with Dr. Hoefflin.[7]

IV-VI*

. . . . . . . . . . . . . . . . . . . . . . . . . .

---

[7]Because we conclude that Mrs. Hurvitz's attempt to withdraw tender was ineffectual, we need not consider whether Dr. Hoefflin had a vested right as a third party claimant that could not be eliminated or altered by agreement between St. Paul and the Hurvitzes. (See *Shapiro v. Republic Indem. Co. of America* (1959) 52 Cal.2d 437, 438–440 [341 P.2d 289] [injured person not bound by lawsuit between insurer and insured leading to reformation of insurance policy since he was not a party].)

*See footnote, *ante*, page 918.

## DISPOSITION

The judgment is affirmed.

Vogel (C. S.), P. J., and Hastings, J., concurred.